# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CT-01951-SCT

*TOTAL TRANSPORTATION, INC. OF*
*MISSISSIPPI AND PROTECTIVE INSURANCE*
*COMPANY*

*v.*

*GERRY LYNN SHORES, WIDOW AND*
*DEPENDENT OF PHILLIP SHORES, DECEASED*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/19/2005 |
| TRIAL JUDGE: | HON. SAMAC S. RICHARDSON |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JEREMY LLOYD CARLSON |
| | JEFFREY A. WALKER |
| | EVE GABLE |
| ATTORNEY FOR APPELLEE: | TINA LORRAINE NICHOLSON |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED.  THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY IS REVERSED AND RENDERED - 09/20/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

### FACTS AND PROCEDURAL HISTORY[1]

---

[1] The following facts and procedural history are taken largely from the Court of Appeals.  ***Total Transp., Inc. v. Shores***, 2006 Miss. App. LEXIS 874, 1-5 (Miss. Ct. App. 2006).

¶1.    Phillip Shores (Shores) and his wife, Lynn Shores (Lynn), were employed by Total Transportation, Inc., of Mississippi (Total) as an over-the-road trucking team. On January 16, 2003, the couple picked up a load in Sunnyside, Washington, and headed toward Jackson, Mississippi, to deliver it. While on the road, the Shoreses began having trouble with their truck and located a Petro station in Laramie, Wyoming, to have the truck repaired. Prior to reaching the Petro station, Lynn dropped off Shores at a Sinclair Fuel Center because he wanted to get away from the truck and get something to eat.

¶2.    Shores had received approximately two hours of sleep in the preceding forty-eight hours and had not had anything to eat in almost twenty-four hours. He told Lynn to go back to the Petro station, repair the truck, and then return to get him. Although they did not specifically discuss where to meet after Lynn dropped off Shores, Lynn testified that it was their custom to meet back wherever they separated. Shores logged off-duty and entered the convenience store. *Lynn also testified that they had been arguing and needed some time apart*.

¶3.    Lynn drove the truck back to the Petro station for the needed repairs. She *returned* to the Sinclair Fuel Station about *an hour and half later, around 6:00 p.m.*, went into the convenience store, but did not see her husband. *The Sinclair Fuel Center was an U-shaped complex consisting of a convenience store, a motel, a liquor store, and Foster's Bar*. There was no sign outside the complex, to indicate that there was a bar inside, so Lynn never looked for her husband there.

2

¶4.    Lynn drove around the Sinclair Fuel Center several times in an attempt to locate Shores.  Lynn then drove back to the Petro and Pilot stations twice *before parking the truck around 10:00 p.m. in the emergency lane on the exit ramp* where she originally had dropped off Shores.  She had a clear view of the Sinclair Fuel Station from that position. She stayed in the truck throughout the night, but she never made contact with her husband.

¶5.    While waiting for her husband, Lynn checked to see if he had made an airline or bus reservation and called Total's dispatcher to see if he had checked in with Total, with no success.  Lynn testified that, while waiting for Shores, she thought he might have been angry enough with Total to quit.  Shores had anger management problems and had quit prior trucking jobs after only short employment periods.  Lynn left Laramie the next day around 6:00 a.m., headed for Jackson, Mississippi.

¶6.    It was later determined that Shores had entered Foster's Bar around *3:00 p.m.* on January 17 and had stayed until *2:00 a.m. when the bar closed*.  During that time, Shores had eaten a meal, consumed several beers, and shot pool with several other patrons.  The bartender later told the local police that Shores "did buy a large amount of alcohol for himself and others."  According to several witnesses, he had appeared *intoxicated while at the bar*. Electronic records showed that he had withdrawn almost the Shoreses' entire paycheck of more than $400 from an automatic teller machine.

¶7.    Christopher Shandy later testified in a guilty plea to kidnaping, attempted aggravated robbery and second degree murder in the Second Judicial District of Albany County, Wyoming, that he arrived at the bar around 11:00 p.m. and, at some point, played pool with

Shores.  ***After the bar closed at 2:00 a.m.***, Shores asked Shandy for a ride to the Petro station.  In the parking lot, Shandy pulled a gun on Shores, ordered him to get in the car, and drove toward the Petro station.  Shores offered Shandy all of his money, but Shandy told him to put it back in his wallet.  He said he wanted to drop off Shores a considerable distance away from the Petro station to have plenty of time to flee the scene before Shores could call the police.

¶8.     Shandy said Shores became nervous when they passed the Petro station and attempted to jump from the moving vehicle.  Shandy admitted shooting Shores in the back as he exited the vehicle.  Shores bled to death after jumping a fence and landing in a ditch a few hundred feet from the Petro station.  ***Shores's autopsy revealed that his blood alcohol content (BAC) was 0.137 grams per deciliter***.  He had $170 in his wallet and less than $20 in his pocket.

¶9.     Total had an alcohol policy which prohibited drivers from consuming alcohol while on duty performing safety-sensitive functions and for a period of four hours before going on duty.  The policy prohibited an employee from reporting for duty with a BAC of .04 percent or greater.  An employee's violation of these policies required mandatory termination.

¶10.    Lynn eventually filed suit against Total and its insurance carrier, seeking workers' compensation benefits for the death of her husband.  The administrative law judge (ALJ) entered an order awarding death benefits to Lynn.  Total appealed the ALJ 's ruling to the Mississippi Workers' Compensation Commission (Commission), which affirmed the ALJ's ruling without comment.  Upon judicial review, the Circuit Court of Rankin County, the Honorable Samac Richardson presiding, affirmed the Commission's decision.

4

¶11.    The Court of Appeals considered the following two assignments of error:

I.      **Whether the Commission erred in holding that Shores was acting in the  course and scope of his employment when he was killed.**

II.     **Whether the Commission erred in holding that the third-party assault on Shores was directed against him because of his employment**.

¶12.    A divided Court of Appeals (6-4) reversed the judgment of the circuit court.  The dissent concluded that Shores's death was compensable as his death arose out of and in the course and scope of his employment.  *Total Transp., Inc.*, 2006 Miss. App. LEXIS 874, at * 50.  The dissent reasoned, "a traveling employee remains in the course of employment during breaks to stop and eat, such activity being reasonably incidental to employment as a traveling employee." *Id.* at 25-26.

¶13.    However, the majority stated:

> . . . Mr. Shores chose to drink large amounts of alcohol and only left the bar because it was closing.  The fact that Mr. Shores remained at the bar for eleven hours, his drinking, his state of mind prior to leaving the truck and even prior employment history clearly indicate that Mr. Shores was not acting reasonably incident to employment.  This was no mere dinner break.

*Total Transp., Inc.*, 2006 Miss. App. LEXIS 874, at * 11-12.  The majority concluded that, "[t]o grant compensation in this case would be contrary to public policy and would effectively erase the 'because of his employment' requirement from the Mississippi Workers' Compensation Act." *Id.* at 21.

¶14.    Lynn filed a successful writ of certiorari with this Court.  We now consider whether the Court of Appeals erred by finding that the Commission was wrong to hold that Shores's

death was compensable. Finding that the Court of Appeals did not err in its judgment, we affirm the judgment of the Court of Appeals reversing the trial court.

## STANDARD OF REVIEW

¶15. The standard of review in workers' compensation cases is limited and deferential:

> The **substantial evidence test** is used. *See* **Walker Mfg. Co. v. Cantrell**, 577 So. 2d 1243, 1245-47 (Miss. 1991). The Workers' Compensation Commission is the trier and finder of facts in a compensation claim. This Court will overturn the Workers' Compensation Commission decision only for an error of law or an unsupported finding of fact. **Georgia Pac. Corp. v. Taplin**, 586 So. 2d 823, 826 (Miss. 1991). Reversal is proper only when a Commission order is not based on substantial evidence, is **arbitrary or capricious, or is based on an erroneous application of the law**. **Smith v. Jackson Constr. Co.**, 607 So. 2d 1119, 1124 (Miss. 1992).

**Weatherspoon v. Croft Metals, Inc.**, 853 So. 2d 776, 778 (Miss. 2003) (emphasis added).

In **Hale v. Ruleville Health Care Ctr.**, 687 So. 2d 1221, 1224-25 (Miss. 1997), the Court stated:

> The function of the circuit court (and of this Court) on appeal from rulings of the Workers' Compensation Commission is to determine whether there exists a quantum of credible evidence which supports the decision of the Commission. It is not the role of the circuit courts to determine where the preponderance of the evidence lies when the evidence is conflicting, given that it is presumed that the Commission, as trier of fact, has previously determined which evidence is credible and which is not. **Metal Trims Industries, Inc. v. Stovall**, 562 So. 2d 1293 (Miss. 1990).

## DISCUSSION

¶16. We first address Total's argument that the Commission erred in holding that the third-party assault on Shores was directed against him "because of" his employment. Total asserts that the Court of Appeals was correct in its decision finding that the Commission improperly

6

applied the relevant law to the question of whether Shores's death, which was caused by a third-party intentional act, was directed against him "because of" his employment.[2] We agree.

¶17. When an employee's injury or death was caused by a third-party intentional act, it must be shown that such willful act was directed against the employee "because of his employment while so employed and working on the job. . . ." Miss. Code Ann. § 71-3-3(b) (Rev. 2000) (emphasis added). "The words 'because of,' like other broadly-construed words of causation with[in] the act, such as 'arising out of,' express the necessity of a nexus between the injury and employment." *Big "2" Engine Rebuilders v. Freeman*, 379 So. 2d 888, 890-91 (Miss. 1980).[3] "The base line is simply a rational connection of employment and injury." *Id.* at 891.

¶18. The Court held:

---

[2] The Mississippi Trucking Association (MTA) also filed an Amicus Curiae brief on the direct appeal, requesting that the Commission's and the circuit court's decisions be reversed. The MTA asserts that the Commission erred in its holding that Shores's death was compensable within the provisions of the Mississippi Workers' Compensation Act. The MTA argues that Shores's death resulted from the willful act of a third party and was not inflicted 'because of' the Decedent's employment.

[3] In *Big "2" Engine Rebuilders*, the claimant worked as a route salesman for the employer, delivering products and taking orders for parts and engine repairs. *Big "2" Engine Rebuilders*, 379 So. 2d at 889. While en route to a garage, the claimant was flagged down by a disabled motorist. *Id.* The motorist struck the claimant in the head, and the claimant sought workmen's compensation benefits for his injuries. *Id.* In its reasoning, the Court focused on the humanitarian aspect of the claimant assisting a stranded motorist, stating: "We think the present claimant's injury resulted from a *humanitarian act* which was *literally thrown into his path because of his employment*." *Id.* at 892 (emphasis added).

We are of the opinion the following facts make this case one of first impression, to be decided as such: (1) no personal vendetta arising from the claimant's activities motivated his injury; (2) *the claimant violated no instructions concerning the manner in which the work was to be carried out; and* (3) *the stop by the roadside upon being flagged down involved no significant deviation either spacially or temporally from the delivery route.* We think an employer may reasonably foresee that his traveling employee will stop to aid a distressed motorist when implored to do so. *Such conduct is an acknowledged incident of being on the road*.

*Big "2" Engine Rebuilders*, 379 So. 2d at 891 (emphasis added).

¶19.  However, there must be a direct connection between the employment and the injury, more than "the merely furnishing of an opportunity" to the third party to commit the assault. *Brookhaven Steam Laundry v. Watts*, 214 Miss. 569, 59 So. 2d 294, 299 (1952).  As such, the employment must be a "contributing cause" of the willful act of the third party, as opposed to merely being a "contributing cause" of the employee being present at the place where the assault occurred.  *Id.* at 299-300.  In *Watts,* the Court examined whether an employee injured by a third party was injured because of his employment.  *Id.* at 302.  Watts was employed as a route man delivering and picking up laundry.  Watts began an affair with Garrett, a married woman.  On the day in question, when Watts came to the Garretts' home to pick up the laundry and dry cleaning, Garrett's husband was at home.  When Watts refused to leave, Garrett's husband shot and killed him.

¶20.  The Court determined that Watts's employment was not the contributing cause of the willful shooting, stating:

There is no direct testimony in the record to show that Watts'[s] employment was in any manner a contributing cause to his injury.  He did not become involved in a quarrel with Garrett over the receipt or delivery of laundry, or the

8

collection of a laundry bill, or because of any dissatisfaction with the service rendered by the Brookhaven Steam Laundry, or by Watts as its employee. Garrett and Watts had [sic] no sharp words concerning the quality of service that Watts had rendered in the handling of the laundry for Garrett and his family. So far as this record shows Garrett killed Watts because Garrett believed that Watts was having improper relations with his wife. The fact that Watts was an employee of the Brookhaven Steam Laundry was a *contributing cause of Watts' [s] being at the Garrett home that day, but it was in no sense a contributing cause of the willful shooting of Watts by Garrett*.

*Id.* at 299 (emphasis added).

¶21.    In *Green v. Glen Oaks Nursing Ctr.*, 722 So. 2d 147, 149-50 (Miss. Ct. App. 1998), the Court of Appeals provided an excellent analysis of whether an injury is compensable where it arose as a result of a risk created by employment conditions, applying the law discussed above.[4]  The Court of Appeals stated:

---

[4]  The Court of Appeals held that Green's injury was compensable under workers' compensation law.  *Green*, 722 So. 2d at 150.  The facts in Green were as follows:

> She [Green] was *required by her employer* (1) to *report for her work shift ten to twenty minutes early* in order to facilitate an efficient shift change, *and* (2) to *park in the rear or side parking lots* of the Nursing Center building in order to allow parking in the front of the building for visitors.
>
> Green arrived for work . . . and parked her vehicle in her *usual parking space in the rear parking lot* of the Nursing Center, all *in accordance with her employer's instructions*. Her parking space was located twenty-five to thirty feet from the back door of the building.
>
> When Green got out of her vehicle, she was accosted by a man with a handgun who demanded that she surrender her purse.  When she did so, she was struck on the head with the handgun and fell to the ground.

*Green*, 722 So. 2d at 148 (emphasis added).

9

Pursuant to section 71-3-7 of the Mississippi Code Annotated (Supp. 1990), an employer is required to compensate an employee for any disability as a result of an injury "arising out of and in the course of employment." A compensable injury includes "an injury caused by the willful act of a third person directed against an employee because of his employment while so employed and working on the job. . . ." *Id*., § 71-3-3 (Supp. 1991). In the past, our supreme court has ruled that a case such as this presents a question of fact for the Mississippi Workers' Compensation Commission as to whether the employee was assaulted because of her employment and while employed and working on the job. *Barry v. Sanders*, 211 Miss. 656, 661, 52 So. 2d 493, 495 (1951). On the other hand, our supreme court has also held that where, as in this case, there is no dispute as to the facts of a case, the issues to be decided become questions of law. *Wilson v. International Paper Co.*, 235 Miss. 153, 157, 108 So. 2d 554, 555 (1959); *Dependents of Roberts v. Holiday Parks, Inc.*, 260 So. 2d 476, 479 (Miss. 1972). We will review this case de novo.

This action involves injuries suffered by an employee which were caused by the intentional acts of an unknown third-party assailant. Our supreme court has stated "injuries caused by third party intentional torts should be compensated whenever it can be fairly said that they occurred 'because of' the employment." *Big "2" Engine Rebuilders v. Freeman*, 379 So. 2d 888, 892 (Miss. 1980). *Big "2"* analyzes the statutory language of section 71-3-7 ("arising out of and in the course of employment") and concludes that in order for a claim to be compensable, there must be some causal connection between the employment and the injury. This causation may be minimal or even "reasonably incidental" to the employment, including "such personal pursuits as cleaning teeth, smoking and procuring tobacco, and going to the telephone." *Id*. at 890 (citing Dunn, MISSISSIPPI WORKMEN'S COMPENSATION, § 178 (2d Ed. 1967). On the other hand, where the intentional tort is committed as the result of a personal vendetta, no causal connection exists, since such an act can as easily be committed in the workplace as anywhere else. *See Brookhaven Steam Laundry v. Watts*, 214 Miss. 569, 636, 55 So. 2d 381 (1952) (where irate husband killed an employee laundry man, suspecting him to be his wife's paramour); *Ellis v. Rose Oil Co.*, 190 So. 2d 450 (Miss. 1966) (where employee's death resulted from his affair with a married woman). As stated by our supreme court, "risks associated with such escapades cannot reasonably be viewed as risks associated with employment." *Big "2" Engine Rebuilders*, 379 So. 2d at 891.

*Green*, 722 So. 2d at 149-150.

¶22. Here, the ALJ reasoned that Shores fell within a "zone of special danger." The ALJ determined that the "because of" requirement merely expressed the need for a causal nexus between the injury and employment, a nexus which was established by Shores's risk of assault, "street risk," which was incidental to his employment as a traveling employee far away from home.

¶23. The Court of Appeals addressed the ALJ's application of a theory of a "zone of special danger," stating:

> The judge invoked the "positional risk doctrine" and held that Shores was killed because of his employment based on "the fact that the risk of assault was a street risk which was incidental to his employment as a traveling employee far away from home." The "positional risk doctrine" was defined in *Johnson v. Roundtree*, 406 So. 2d 810 (Miss. 1981), as follows:
>
> > Since every jurisdiction now accepts, at the minimum, the principle that a harm is compensable if its risk is increased by the employment, the clearest ground of compensability in the assault category is a showing that the particular character of claimant's job or because of the special liability to assault associated with the environment in which he must work. Among the particular jobs that have, for self-evident reasons, been held to subject an employee to a special risk of assault are . . . those jobs that specially expose the employee to lawless or irresponsible members of the public, . . . or that merely subject the employee to increased and indiscriminate contact with the public, such as the jobs of streetcar conductor, bus driver, taxi driver or hotel manager.
>
> *Roundtree*, 406 So. 2d at 811 n.1 (quoting 1 Larson's Workmen's Compensation Law, § 11.11(a) (1978)).
>
> In *Johnson*, the supreme court held that the death of Roundtree, a taxicab driver who was shot in the head while picking up a fare, was compensable. *Id*. The court found a rational connection between Roundtree's employment and his death based on the positional risk doctrine:

11

Roundtree was exposed to the hazard of robbery or assault because of the nature of his employment; and . . . his death would not have occurred except for the fact that his employment conditions placed Roundtree in the position where he was injured by a force neither personal to him nor associated with his employment.

*Id.* at 810-11.

A few other Mississippi cases have employed a rule similar to the "positional risk doctrine" in cases involving third party intentional torts. . . .

This Court applied the aforementioned rule in *Green v. Glen Oaks Nursing Ctr.*, 722 So. 2d 147 (Miss. Ct. App. 1998). Green was a nurse who worked the night shift from 11:00 p.m. to 7:00 a.m. at the Glen Oaks Nursing Center. She was forced to park in a secluded parking lot without security guards and one night she was assaulted and robbed in the parking lot by an unknown assailant. This Court held that "the injury to Green arose as a result of a risk created by employment conditions." *Id.* at 150. In a similar case, *Adams v. Lemuria, Inc.*, 738 So. 2d 295 (Miss. Ct. App. 1999), this Court held that the injuries sustained by an employee, who was injured when she jumped from her car after being abducted in the parking lot of her employer, arose as a result of a risk created by employment conditions. *Id.* at 298.

However, in *Sanderson Farms, Inc. v. Jackson*, 911 So. 2d 985 (Miss. Ct. App. 2005), Jackson was hit over the head at work with a two-by-four by a co-worker from whom he had demanded repayment of a ten dollar loan. This Court held that the Sanderson Farms chicken plant was not a "zone of danger" and that "the risk to Jackson in this case arose solely from his personal disagreement with Allen concerning the ten dollar loan." *Id.* at 991.

*Total Transp., Inc.*, 2006 Miss. App. LEXIS 874, at * 15-20.

¶24. We find that the Commission's decision did not properly apply the relevant law to the facts of this case. Here, as the Court of Appeals stated:

. . . Shores's employment did not require him to be in Foster's Bar at 2:00 a.m. His employment required him to visit truck stops, not the bars located in or near truck stops.

12

. . .

> Shores's death did not originate with his personal indiscretions, but the *extended escapade he went on at Foster's Bar exposed him to risks that cannot reasonably be viewed as being associated with the trucking business or arising out of or in the course of his employment*.

*Total Transp., Inc.*, 2006 Miss. App. LEXIS 874, at * 20-21 (emphasis added).

¶25.   Shores entered the bar around 3:00 p.m. and stayed there for approximately *eleven hours*.  Although he did eat, Mr. Shores stayed at the bar in order to *drink and play pool*. He withdrew his weekly paycheck of more than $ 400 to *buy drinks for himself and other patrons*.  Witnesses described Shores as intoxicated.  Lynn testified that she looked for Shores from approximately 6:00  p.m. until 10:00 p.m. before she finally parked where she dropped him off, waiting there until 6:00 a.m.

¶26.   Lynn testified that she thought Shores may have been so angry that he quit, and she called the dispatcher to see if Shores had called and quit.  She testified that Shores had worked for six trucking companies from October 2000 until they began working for Total in mid-2002.  Shores's anger management problem was the reason for his termination from these prior trucking jobs, including threatening his employer, threatening to wreck his truck, abandoning his truck, and throwing a rock at his truck, breaking the windshield.  Prior to exiting the truck, Mr. Shores was angry with his wife and with Total because of problems and delays in repairing the truck.

¶27.   The Court of Appeals correctly determined that the Commission expanded the relevant law by finding that Shores's death, which was caused by a third-party intentional

act, was directed against him because of his employment and therefore compensable. We affirm the judgment of the Court of Appeals finding that Shores's death was not compensable. Since we find that Shores's death was not a result of his employment with Total, and therefore not compensable under workers' compensation law, this assignment of error is dispositive of this appeal.

## CONCLUSION

¶28.    We find that the Commission improperly applied the law by holding that Shores's death was compensable. Therefore, the judgment of the Court of Appeals, which reversed the trial court's and the Commission's decision and rendered judgment in favor of Total, is affirmed, and the judgment of the Rankin County Circuit Court is reversed and rendered.

¶29.    **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY IS REVERSED AND RENDERED.**

**SMITH, C.J., WALLER, P.J., CARLSON, RANDOLPH AND LAMAR, JJ., CONCUR. DICKINSON, J., CONCURS IN PART AND IN RESULT. DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶30.    Mississippi Code Section 71-3-7 states that "compensation shall be payable for disability or death of an employee from injury or occupational disease arising out of and in the course of employment, *without regard to fault* as to the cause of the injury or occupational disease." Miss. Code. Ann. § 71-3-7 (Rev. 2000) (emphasis supplied). Accordingly, I must respectfully dissent.

14

¶31. As the majority notes, the function of this Court on appeal from rulings of the Workers' Compensation Commission is to determine whether credible evidence exists which supports the decision of the Commission. The Commission found that Shores's death arose out of and in the course and scope of his employment and that the injury was directed against him because of his employment. This Court will overturn the Workers' Compensation Commission decision only when a Commission order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law. *Smith v. Jackson Constr. Co.*, 607 So. 2d 1119, 1124 (Miss. 1992).

¶32. The majority cites *Brookhaven Steam Laundry v. Watts*, 214 Miss. 569, 59 So. 2d 294 (1952), for its finding that the Commission's order was based erroneous application of law. In *Brookhaven*, an employee was killed while delivering laundry to a customer's home. *Id.* While his employment required Watts to be in the customer's home that day, it was not a contributing cause to his death. *Id.* Watts was killed by the homeowner because Watts was having improper relations with the homeowner's wife. *Id.*, 214 Miss. at 635. The majority compares Watts with Shores, finding that, although their employment contributed to their being in the places they were killed, it was their egregious conduct that caused their deaths. "[W]here the intentional tort is committed as the result of a personal vendetta, no causal connection exists, since such an act can as easily be committed in the workplace as anywhere else." *Green v. Glen Oaks Nursing Ctr.*, 722 So. 2d 147, 149 (Miss. Ct. App. 1998) (citing *Brookhaven*, 214 Miss. 569, 636, 55 So. 2d 381 (1952)).

15

¶33. The majority fails to acknowledge the distinction between Shores and Watts. Although Shores's drinking constituted negligent conduct, a causal connection between his employment and injury remains, going beyond "the mere furnishing of an opportunity" as required for compensation. *Brookhaven*, 214 Miss. at 635. Undeniably, Shores was killed at random by a "lawless [,] irresponsible member[] of the public," not as a result of a personal vendetta. *Johnson v. Roundtree*, 406 So. 2d 810, 811, note 1 (Miss. 1981). Shores was exposed to the hazard of robbery and assault because of the nature of his employment. This is supported by the testimony of other truck drivers. Lynn Shores testified that she had been instructed by Total not to exit the truck at a truck stop after dark because truckers had been robbed at fuel stations. She also testified that truckers are preyed upon because they must carry their money and personal items with them on trips. For these reasons, it is reasonably foreseeable for truckers such as Shores to be preyed upon at various stops by opportunistic criminals. *See Big "2" Engine Rebuilders v. Freeman*, 379 So. 2d 888 (Miss. 1980) (holding that traveling salesman was entitled to compensation resulting from roadside assault).

¶34. It is important to note that Shores remained where his wife and driving partner left him for eleven hours. The majority bases its opinion on the fact that Shores's employment did not require him to be in Foster's Bar at 2:00 a.m. However, Shores remained at the place his partner left him. When his partner did not return, Shores eventually tried to get back to the Petro station where he believed the truck was being repaired, and in doing so, was killed.

16

¶35.   The majority construes the standard governing compensable injuries too narrowly; the applicable law requires only that Shores's employment contributed to, aggravated, or accelerated the injury, in this case his death.   The sole issue before the Workers' Compensation Commission was whether Shores's death met the definition of a compensable injury under Section 71-3-3(b), which provides in part:

> Injury meaning accidental injury or accidental death arising out of and in the course of employment without regard to fault which results from an outward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner . . . this definition . . . also includes an injury caused by the willful act of a third person directed against an employee because of his employment while so employed and working on the job . . .

Miss. Code Ann. § 71-3-3(b) (Rev. 2000).  Shores's employment significantly contributed to his death.

¶36.   Since Shores consumed alcohol before his death, the majority emphasizes the issue of whether Shores was considered employed with Total at the time of his death.  Although Shores was in violation of the regulations set forth by Total prohibiting the consumption of alcohol, it does not preclude him from compensation.

¶37.    In *Tyson Foods, Inc. v. Hillard*, 772 So. 2d 1103, 1105 (Miss. Ct. App. 2000), the Court of Appeals addressed the effect of an employee's intoxication at the time of his injury on the compensability of his injury, which was otherwise work-related. Regardless of whether Shores's intoxication contributed to his death, such conduct is not an issue in whether benefits for the injury arising on the job are payable.  *Id.*  Should such conduct be discovered before it causes injury, then termination or other discipline of the employee may

17

be appropriate. ***Total Transp., Inc. of Mississippi v. Shores***, 2006 Miss. App. LEXIS 894, ¶ 48 (Miss. App. 2006) (Chandler, J., dissenting).

¶38.    Finally, this Court has held that the Workers' Compensation scheme mandates that "doubtful cases must be compensated." ***Big "2" Engine Rebuilders***, 379 So. 2d at 889.

¶39.    For the reasons above, I respectfully dissent from the majority.  I would reverse the Court of Appeals and the trial court finding that Shores's death was not compensable.

**GRAVES, J., JOINS THIS OPINION.**