KING, C.J.,
 

 for the Court:
 

 ¶ 1. Shirley Cole injured her left knee while performing her duties as a caretaker at Ellisville State School. Thereafter, she applied for disability benefits through the Mississippi Workers’ Compensation Commission. The administrative judge (AJ) found that Cole had sustained a permanent-partial disability and awarded her full benefits for the scheduled member. Ellis-ville appealed the AJ’s decision to the full Commission. In a two to one decision, the Commission ruled that Cole had only sustained a fifty-percent permanent-partial disability and amended the AJ’s order. Both parties appealed to the Circuit Court of Jones County, and the trial court affirmed the Commission’s decision.
 

 ¶ 2. Aggrieved, both parties have appealed. Cole argues that the Commission erred as a matter of law in its determination of her award of benefits and that the Commission’s decision is not supported by the evidence. In its cross-appeal, Ellisville argues that Cole’s award of benefits should have been limited to her medical impairment rating. Finding that the Commission erred by reducing Cole’s award of permanent-partial disability benefits, we reverse and render.
 

 FACTS AND PROCEDURAL HISTORY
 

 A. Cole’s Employment History
 

 ¶ 3. Cole’s employment history began in 1992. During that time, Cole was employed part time for four months as a secretary for a sewage and water board. The remainder of Cole’s employment was either in. food service or as a caretaker. From 1994 to 1995, Cole was employed at Our Lady Star of the Sea Catholic School in the food-service department, which required her to cook with large kettles and lift food weighing up to fifty pounds. Thereafter, Cole was employed as a caretaker at County Care Nursing Home. This job required Cole to feed and-bathe residents, prepare them for transport to the hospital, and cook.
 

 ¶ 4. In 1998, Cole began her employment with Ellisville in the food-service department. Cole was required to clean and cook, which included lifting cleaning supplies and food weighing up to twenty-five pounds and standing for approximately six hours a day. Cole left Ellisville in 1999 to work for the East Mississippi State Hospital. There, she was employed as a cook and as a supervisor in the food-service department. In 2003, Cole returned to
 
 *614
 
 Ellisville and began work as a caretaker for disabled residents. Cole’s duties included bathing the residents, feeding them, dressing them, assisting the residents to the restroom, and transporting them throughout the facility. Cole was required to lift the residents while performing most of her duties. She testified that she received assistance lifting the patients from either another caretaker or by using a mechanical lift.
 

 B. Cole’s Injury
 

 ¶ 5. On November 26, 2005, Cole twisted her left knee while lifting a resident. Cole later discovered she had a torn meniscus, which required surgery. Cole also eventually received a knee replacement. During this time, Cole was on leave and received temporary disability benefits from Ellis-ville. She filed her petition to controvert on July 14, 2006.
 

 ¶ 6. On November 16, 2006, Ellisville terminated Cole because she had exceeded the number of days allowable for leave without pay. In a letter, Ellisville stated that Cole had been informed by the human-resources department of the options available to her, and Ellisville encouraged Cole to reapply for a job once she was released by her doctor.
 

 C. The Hearing
 

 ¶ 7. A hearing was held before the AJ on March 2, 2008. Cole testified that, following her termination from Ellisville, she remained unemployed. Cole testified that her knee constantly popped; it was very painful; and she could not bend it properly. Thus, Cole believed that she would not be able to lift patients, evidencing a danger to the patients. On cross-examination, Cole testified that she had not sought work and that no physician had told her that she could not work at all. Cole explained that she did not apply for a job with Ellisville, or anywhere else, because she is in constant pain. In addition to Cole’s testimony, the depositions of three orthopedic surgeons, who had treated and/or examined Cole, were admitted into evidence.
 

 I. Dr. Stephen Nowicki
 

 ¶ 8. On November 29, 2005, Dr. Stephen Nowicki, an orthopedic surgeon, examined Cole’s knee and determined that she had torn her meniscus. Dr. Nowicki explained that the meniscus functioned as a “shock absorber” in the knee, dispersing a person’s body weight and reducing stress on the knee. He also diagnosed Cole with degenerative joint disease. Dr. Nowicki opined that Cole’s degenerative joint disease was not caused by her injury, but it was exacerbated by it.
 

 ¶ 9. Cole’s meniscus was torn beyond repair; therefore, on December 8, 2005, Dr. Nowicki performed a resection on Cole’s meniscus. Dr. Nowicki explained that a resection involved removing the torn portions of the meniscus, creating an abnormal situation where more stress is applied to the knee. He opined that with or without the torn meniscus, Cole would need a knee replacement in the future, especially if she continued to experience pain in her knee.
 

 ¶ 10. According to Dr. Nowicki, Cole had reached maximum medical improvement on March 14, 2006, and he assigned Cole a seven-percent impairment rating to her left leg. He imposed restrictions of no prolonged standing or walking and no lifting over ten pounds.
 

 2. Dr. Guy Vise
 

 ¶ 11. Dr. Guy Vise, an orthopedic surgeon, examined Cole at the request of Ellisville. Dr. Vise diagnosed Cole as having a pre-existing degenerative joint disease, and he noted her torn meniscus. Dr. Vise opined that Cole’s degenerative joint disease and her torn meniscus were unre
 
 *615
 
 lated. He opined that a knee replacement was not necessary; instead, he stated that a knee replacement would be an elective procedure. Dr. Vise explained that the American Medical Association’s guidelines assessed a two-percent impairment rating for a partial meniscus tear and a seven-percent impairment rating for a total meniscus tear. Dr. Vise assessed Cole’s left leg with a two-percent impairment rating. Comparing his assessment to Dr. Now-icki’s assessment, Dr. Vise opined that either Dr. Nowicki mistakenly assessed Cole the higher rating, or Dr. Nowicki assessed Cole the higher rating based upon the amount of her meniscus he actually removed.
 

 3. Dr. Richard Conn
 

 ¶ 12. Dr. Richard Conn examined Cole on June 18, 2006, and determined that she was at the end stage of degenerative joint disease. Dr. Conn opined that Cole’s degenerative joint disease was pre-existing. However, her injury exacerbated her condition. Because there were no other conservative forms of treatment available, Dr. Conn determined that Cole was a candidate for a total knee replacement.
 

 ¶ 13. Dr. Conn performed Cole’s knee replacement on June 27, 2006. Cole was released at maximum medical improver ment on January 3, 2007, and Dr. Conn assessed Cole a twenty-five-percent impairment rating to her left leg. Dr., Conn placed restrictions on Cole because of the knee replacement. Those restrictions included no prolonged standing or walking, no climbing, and no lifting greater than twenty-five pounds. Dr. Conn opined that subject to Cole’s restrictions, she would be employable.
 

 4. The Administrative Judge’s Ruling
 

 ¶ 14. Based on the foregoing, the AJ determined that Cole’s knee injury had led to her total knee replacement and that the knee replacement was medically necessary and compensable. Due to Cole’s restrictions, the AJ determined that Cole could no longer perform the substantial acts of her usual employment. The AJ ruled that Cole suffered a total industrial loss of use of her left leg and awarded her permanent-partial disability benefits for the scheduled member — $180.03 per week for 175 weeks.
 

 D. The Commission’s Ruling & Subsequent Procedural History
 

 '¶ 15. Ellisville appealed the decision to the Commission. The Commission’s majority decision found that:
 

 [Cole] completed two years of junior college with an emphasis in word processing and secretarial skills, and her employment history includes previous work as a secretary. [Cole] admitted that she has not looked for a job and that none of her physicians have told her that she is unable to work. Based on the evidence as a whole, including the restrictions assigned to [Cole] by her physicians, her age, education, and past work experience, we find that she has sustained a significant loss of industrial use of her left lower extremity which we reasonably estimate to be 50%.
 

 Based on the foregoing, the majority amended the AJ’s order to reflect the reduction.
 

 ¶ 16. ■ Because Cole’s secretarial work spanned only four months in 1992, the dissent disagreed that secretarial work was a viable option for her. The dissent noted that Cole had been employed in food service or as a caretaker; thus, this was her usual employment. The dissent also stated that Cole’s failure to seek other employment was not relevant to her claim for permanent-partial disability benefits. Based on the evidence, the dissent suggested that Cole could not perform the
 
 *616
 
 substantial acts of her employment, proving that she had sustained a total loss of industrial use of her left leg.
 

 ¶ 17. Both parties appealed the Commission’s majority decision to the trial court. The trial court affirmed the Commission’s majority decision. Aggrieved, both parties timely filed their notice of appeal.
 

 STANDARD OF REVIEW
 

 ¶ 18. The Commission is the ultimate finder of fact.
 
 Total Transp., Inc. of Miss. v. Shores,
 
 968 So.2d 400, 404 (¶ 15) (Miss.2007). Thus, on appeal, we review whether the Commission’s decision was supported by substantial evidence.
 
 Id.
 
 We will not disturb the Commission’s decision unless it is “not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law.”
 
 Id.
 
 (citation omitted).
 

 ANALYSIS
 

 ¶ 19. In its cross-appeal, Ellisville argues that Cole’s award of disability benefits should have been limited to her twenty-five-percent impairment rating. Because Ellisville abandoned this issue during oral argument, it will not be addressed here. The Court will only consider whether Cole is entitled to 175 weeks of permanent-partial disability benefits as awarded by the AJ or whether Cole is only entitled to 87.5 weeks of permanent-partial disability benefits as awarded by the Commission.
 

 ¶ 20. Cole argues that the Commission based its ruling on an erroneous application of the law, and the ruling was not supported by the evidence. Specifically, Cole argues that the Commission improperly considered her loss of wage-earning capacity in her award of permanent-partial disability benefits. Ellisville argues that Cole made no effort to seek other employment, failing to prove á total loss of use of her leg; thus, the Commission did not err by reducing Cole’s award of benefits.
 

 ¶21. When seeking compensation for a work-related injury to a scheduled member, a claimant may pursue two avenues of compensation under Mississippi Code Annotated section 71-3-17 (Rev. 2000). Claimants asserting that an injury to a scheduled member caused them to have a permanent-total disability may pursue compensation under section 71-3-17(a). Under this subsection, the claimant may receive sixty-six and two-thirds percent of her salary for up to four hundred and fifty weeks. “To demonstrate total disability, the claimant must show that [she] has made a diligent effort, but without success, to obtain other gainful employment.”
 
 Adolphe Lafont USA, Inc., v. Ayers,
 
 958 So.2d 833, 839 (¶ 18) (Miss.Ct.App.2007). Then, the employer is allowed to rebut this evidence.
 
 Id.
 

 ¶ 22. If the claimant does not claim a permanent-total disability, she may pursue compensation under section 71-3-17(c), which provides compensation for the loss of a scheduled member. In the case of the loss or loss of use of a leg, section 71-3-17(c) provides the claimant with sixty-six and two-thirds percent of her salary for up to one-hundred and seventy-five weeks. Under this subsection, compensation “is based solely on the degree of disability to the scheduled member and does not take into account the effect of that disability on the claimant’s actual ability to earn wages in her post-injury condition.”
 
 Ard v. Marshall Durbin Companies, Inc.,
 
 818 So.2d 1240, 1245 (¶ 25) (Miss.Ct.App.2002) (citing
 
 Smith v. Jackson Constr. Co.,
 
 607 So.2d 1119, 1128 (Miss.1992)). However, there are instances in which the injury’s effect on the claimant’s ability to work is relevant.
 

 
 *617
 
 ¶23. A claimant may seek two avenues of compensation under the scheduled-member statute: (1) compensation based on the degree of functional loss, as previously addressed, and (2) compensation based on the industrial loss of use of the member.
 
 See Mueller Copper Tube Co., Inc. v. Upton,
 
 980 So.2d 428, 435 (¶ 26) (Miss.Ct.App.2005). The claimant is to be awarded benefits based on the greater amount of the two.
 
 Id.
 

 ¶ 24. Ellisville relies heavily on
 
 Meridian Professional Baseball Club v. Jensen,
 
 828 So.2d 740 (Miss.2002) to support its position that Cole failed to prove a total loss of use of her leg because she had made no effort to seek other employment. In
 
 Jensen,
 
 the supreme court held that:
 

 [W]here a permanent partial disability renders a worker unable to continue in the position held at the time of injury, we hold that such inability creates a rebuttable presumption of total occupational loss of the member, subject to other proof of the claimant’s ability to earn the same wages which the claimant was receiving at the time of injury. The presumption arises when the claimant establishes that he has made a reasonable effort but has been unable to find work in his usual employment,
 
 or
 
 makes other proof of his inability to perform the substantial acts of his usual employment. ...
 

 Id.
 
 at 747-48 (¶ 21) (emphasis added). Based on the foregoing, Cole could have shown that she suffered a total industrial or occupational loss of use of her leg by either demonstrating an unsuccessful attempt to find other work or by demonstrating that she could not perform the substantial acts of her usual employment. Whether á claimant diligently, but unsuccessfully, sought other employment is typically a consideration in permanent-total disability cases, which Cole is not seeking.
 
 See Lott v. Hudspeth Ctr.,
 
 26 So.3d 1044, 1049 (¶ 15) (Miss.2010). Nevertheless, Cole chose to demonstrate that she could not perform the substantial acts of her usual employment. Thus, the fact that Cole did not seek employment with Ellis-ville or any other company is not conclusive of whether she was entitled to permanent-partial disability benefits for the industrial loss of use of her leg.
 

 ¶ 25. Next, the inquiry is whether Cole successfully demonstrated that she could not perform the substantial acts of her usual employment. “Usual” is defined as “[ojrdinary; customary” and “expected based on previous experience.” Black’s Law Dictionary (8th ed.2004). The Commission’s majority determined that “[Cole] sustained a substantial industrial loss of use of her lower extremity, [but it was] unable to conclude that such loss of use was total.” To support its position, the majority pointed out that Cole completed two years of junior college with an emphasis in word processing, and her employ-' ment history included previous work as a secretary. However, we find that the majority’s conclusion that Cole did not suffer a total loss of use of her leg is not supported by the evidence.
 

 ¶ 26. The Mississippi Supreme Court has held that “the scope of ‘usual employment’ is broader than the job held at the time of the injury.”
 
 Weatherspoon v. Croft Metals, Inc.,
 
 853 So.2d 776, 779 (¶ 14) (Miss.2003). In
 
 Weatherspoon,
 
 the claimant had been working at Croft Metals, Inc. on an assembly line for only four months before she developed carpal tunnel.
 
 Id.
 
 at 777 (¶ 2). Physicians assigned her a ten-percent permanent-partial impairment rating to her hands.
 
 Id.
 
 On appeal, Brenda Weatherspoon argued that she received a total loss of use of her hands because she could not perform the substantial acts of her assembly-line job.
 
 *618
 
 The supreme court determined that Weatherspoon’s usual employment was broader than her assembly-line job.
 
 Id.
 
 at 779 (¶ 14). Prior to that, Weatherspoon held various jobs, and she held a commercial driver’s license.
 
 Id.
 
 at (¶ 13). Post injury, she also found employment as a truck driver.
 
 Id.
 
 Although Weatherspoon could not perform the substantial acts of her assembly-line job, the supreme court held that Weatherspoon was not entitled to benefits for the total loss of the scheduled members.
 
 Id.
 

 ¶ 27. This was also the case in
 
 Jensen.
 
 A young, professional baseball player sought workers’ compensation benefits for an injury he had received to his throwing arm.
 
 Jensen,
 
 828 So.2d at 743 (¶¶ 2-3). Physicians assigned Blair Jensen a seven-percent permanent-partial impairment rating and determined that he could no longer play baseball.
 
 Id.
 
 at (¶ 3). Thus, Jensen argued that he had suffered a total industrial loss of use of his arm.
 
 Id.
 
 The supreme court determined that Jensen’s usual employment' was broader than his seasonal work as a baseball player. During off seasons, Jensen had worked as “a sports coach, construction worker[,] and produce packer.”
 
 Id.
 
 at (IT 2). He also worked various other part-time jobs while attending college.
 
 Id.
 
 Based on the foregoing, the supreme court determined Jensen failed to prove that he had suffered a total industrial loss of use of his arm.
 

 ¶ 28. This case is distinguishable from
 
 Jensen
 
 and
 
 Weatherspoon.
 
 Unlike the claimants in
 
 Jensen
 
 and
 
 Weatherspoon,
 
 Cole did not hold a hodgepodge of jobs over her career. For over a decade, Cole’s work was mainly focused in two areas— food service and as a caretaker. Working as a part-time secretary for approximately four months in 1992 can hardly be considered part of. Cole’s usual employment.
 

 ¶ 29. In food service and as a caretaker, Cole was required to walk and stand for prolonged periods of time and to lift heavy items and disabled persons. After Cole’s knee-replacement surgery, Dr. Conn placed restrictions on Cole prohibiting prolonged walking and standing and lifting over twenty-five pounds. Dr. Conn opined that Cole was employable subject to her restrictions. Cole testified that her injury prevented her from performing the substantial acts of her employment in food service and as a caretaker. Based on Cole’s injury and her restrictions, we find that Cole is unable to perform the substantial acts of her usual employment in food service and as a caretaker.
 

 CONCLUSION
 

 ¶ 30. We find that Cole proved that she had suffered a permanent-partial disability to the scheduled member by showing that she could not perform the substantial acts of her usual employment in food service and as a caretaker. Thus, we reverse the Commission’s decision, which reduced Cole’s award of permanent-partial disability benefits, and reinstate the AJ’s decision.
 

 ¶ 31, THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY IS REVERSED, AND JUDGMENT IS RENDERED TO REINSTATE THE DECISION OF THE ADMINISTRATIVE JUDGE OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE/CROSS-APPELLANT.
 

 LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. IRVING, J„ CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J„
 
 *619
 
 CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.