# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-WC-00288-COA

**MUELLER INDUSTRIES, INC. AND STONINGTON INSURANCE COMPANY**  <span style="float:right">**APPELLANTS**</span>

**v.**

**SHANNON WAITS**  <span style="float:right">**APPELLEE**</span>

| | |
|---|---|
| DATE OF JUDGMENT: | 02/08/2018 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEY FOR APPELLANTS: | DAVID B. McLAURIN |
| ATTORNEY FOR APPELLEE: | YANCY B. BURNS |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 04/09/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., TINDELL AND McDONALD, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1. Mueller Industries and its insurance carrier, Stonington Insurance Company,[1] appeal the Mississippi Workers' Compensation Commission's (the Commission) order finding that Shannon Waits suffered a 100% industrial loss of use in his right upper extremity and awarding Waits temporary total disability benefits, as well as permanent partial disability benefits.

¶2. On appeal, Mueller Industries asserts the following assignments of error: (1) the Commission erred in its finding of a 100% permanent partial disability; and (2) the

---

[1] We will refer to the appellants collectively as Mueller Industries.

administrative judge (AJ) improperly showed partiality toward Waits.

¶3.    After our review, we find no error by the Commission.  We therefore affirm the Commission's decision and award of benefits.

**FACTS**

¶4.    On November 14, 2014, Shannon Waits fell and suffered injuries to his right arm and shoulder while working as a breakout operator[2] for Mueller Industries.  After his injury, Mueller presented to the emergency room at North Mississippi Medical Center and underwent surgery.

¶5.    Waits filed a petition to controvert with the Commission on January 28, 2016, claiming that he suffered injuries to his right arm and shoulder.  On March 8, 2017, Mueller Industries filed its answer admitting that Waits suffered the injuries that he set forth in his petition to controvert.

¶6.    On June 14, 2017, the AJ held a hearing on the matter.  At the hearing, the AJ heard testimony from Waits,[3] as well as from Daniel Turner, an expert in vocational rehabilitation; and Travis Fisher, the human resources and safety director at Mueller Industries.  The AJ also reviewed deposition testimony from Dr. George Van Osten III, the orthopaedic trauma physician who treated Waits on the day of his injury, and Dr. William Geissler, an expert in the field on orthopaedic surgery who treated Waits.  The AJ further reviewed Waits's

---

[2] Waits explained that as a breakout operator, he would relieve other machine operators during their breaks.

[3] Waits also testified by depositions taken on March 2, 2016, and March 31, 2017.

vocational report prepared by Daniel Turner; evidence relating to Waits's job search; Waits's Physical Therapy-Functional Capacity Evaluation (FCE), administered by Christin Boyd, OTR/L.; as well as Waits's medical records.

¶7.     On July 25, 2017, the AJ entered an order finding as follows:

> [Waits] is rendered unable to return to his previous employ, and he cannot return to that job should the circumstances permit as he is unable to perform the substantial acts of his usual occupation. The actual occupational effect has the same substantial effect as a total loss of the member. . . . It is the considered opinion of this Administrative Judge that the industrial loss of use in this instance is one hundred percent (100%).

The AJ accordingly held that "[c]ommencing on November 13, 2014 and concluding on February 13, 2017, temporary total disability benefits are applicable with proper credit to be given for any and all monies, wages or benefits previously paid to [Waits] during the aforementioned time frame." The AJ also awarded Waits permanent partial disability benefits in the amount of $454.42 per week for a period of two hundred weeks, which the AJ explained was "illustrative of one hundred percent (100%) industrial loss of use relative to the right upper extremity."

¶8.     On August 7, 2017, Mueller Industries filed a petition for review of the AJ's decision, arguing that the finding and decision of the AJ was contrary to the credible evidence, contrary to the weight and overwhelming evidence, and contrary to the law. Mueller Industries later filed an amended brief in support of its petition for review, asserting that the AJ erred by showing partiality in favor of Waits in her finding and decision as exhibited by her actions prior to the Full Administrative Hearing.

¶9.     On February 8, 2018, the Commission issued its Full Commission Order and

3

summarily affirmed and adopted the AJ's order. Mueller Industries filed its notice of appeal on February 22, 2018.

## STANDARD OF REVIEW

¶10. This Court employs a limited standard when reviewing a workers' compensation appeal. *Weathersby v. Mississippi Baptist Health Sys. Inc.*, 195 So. 3d 877, 882 (¶20) (Miss. Ct. App. 2016). On appeal, we are limited to reviewing "whether the Commission's decision is supported by substantial evidence." *Id.* (quoting *Lott v. Hudspeth Ctr.*, 26 So. 3d 1044, 1048 (¶12) (Miss. 2010)). "This Court will reverse an order of the Commission only where such order is clearly erroneous and contrary to the overwhelming weight of the evidence." *Id.*

¶11. We further recognize "that the Commission, not the AJ, is the ultimate fact-finder." *Weathersby*, 195 So. 3d at 883 (¶23) (quoting *Smith v. Jackson Constr. Co.*, 607 So. 2d 1119, 1123 (Miss. 1992)). "When the Commission adopts the AJ's findings and conclusions, we review the AJ's findings and conclusions as those of the Commission." *River Region Health Sys. v. Adams*, 115 So. 3d 863, 866 (¶13) (Miss. Ct. App. 2013).

## ANALYSIS

### I.      Findings and Decision of the Commission

¶12. On appeal, Mueller Industries asserts that "the key question in the instant case is whether Waits's usual employment was his employment at the time of the [w]orkers' [c]ompensation injury, i.e. his employment at Mueller Industries, Inc. or employment in 'production.'" Mueller Industries argues that the Commission's finding that Waits suffered a 100% permanent partial disability of his upper right extremity due to his inability to return

4

to his previous employment and his inability to perform the substantial acts of his usual occupation is contrary to the overwhelming weight of the credible evidence and also contrary to the law. Mueller Industries asserts that Waits's employment with Mueller Industries, which the AJ described in its order as "production," is not Waits's "usual occupation." Rather, Mueller Industries maintains that Waits himself declared his usual occupation to be that of sales. Mueller Industries therefore argues that the evidence presented at the hearing fails to support the Commission's finding that Waits is physically incapable of returning to employment in the sales field.

¶13. Mueller Industries also asserts that because the Commission summarily dismissed any need to conduct an analysis regarding Waits's reasonable effort to find work, the issue of whether Waits made a prima facie case that he has made a reasonable effort to find work is not properly before this Court on appeal.

¶14. Waits, however, asserts that every job he had performed over the last eight years required lifting fifty pounds occasionally. Waits argues that according to his medical restrictions, he is only capable of occasionally lifting 18.5 pounds. Waits therefore argues that the medical evidence clearly establishes that the injury prohibits him from performing the occupation he performed at the time of the injury and his usual employment.

¶15. The Mississippi Workers' Compensation Law provides that "[w]orkers are entitled to be compensated for total loss or total loss of use of a scheduled member in accordance with the number of weeks provided by statute." *Meridian Prof'l Baseball Club v. Jensen*, 828 So. 2d 740, 745 (¶12) (Miss. 2002). Here, the Commission awarded Waits permanent partial disability benefits under Mississippi Code Annotated section 71-3-17(c) (Rev. 2011)

5

due to the loss of use of his right upper extremity. Section 71-3-17(c) directs that compensation for disability shall be paid to the employee as follows:

> (c) Permanent partial disability: In case of disability partial in character but permanent in quality, the compensation shall be sixty-six and two-thirds percent (66-2/3%) of the average weekly wages of the injured employee, subject to the maximum limitations as to weekly benefits as set up in this chapter, which shall be paid following compensation for temporary total disability paid in accordance with paragraph (b) of this section, and shall be paid to the employee as follows:

> | Member Lost | Number Weeks Compensation |
> | --- | --- |
> | (1) Arm | 200 |

> . . . .

> (22) Total loss of use: Compensation for permanent total loss of use of a member shall be the same as for loss of the member.

> (23) Partial loss or partial loss of use: Compensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member.

Miss. Code Ann. § 71–3–17.

¶16.    "The law compensates for two types of loss of use: (1) 'functional' or 'medical' and (2) 'industrial' or 'occupational.'" *City of Laurel v. Guy*, 58 So. 3d 1223, 1226 (¶13) (Miss. Ct. App. 2011). The supreme court has clarified that "[i]ndustrial or occupational loss is the functional or medical disability as it affects the claimant's ability to perform the duties of employment." *Meridian Prof'l Baseball Club v. Jensen*, 828 So. 2d 740, 745 (¶11) (Miss. 2002) (internal quotation marks omitted) (quoting *McGowan v. Orleans Furniture Inc.*, 586 So. 2d 163, 166 (Miss. 1991)). In cases like the one before us, where a claimant's industrial/occupational loss is greater than the medical/functional loss, "the claimant's industrial or occupational disability or loss of wage-earning capacity controls his degree of

6

disability." *Smith v. Jackson Const. Co.*, 607 So. 2d 1119, 1126 (Miss. 1992) (citing *Richey v. City of Tupelo*, 361 So. 2d 995, 997-98 (Miss. 1978) (50% permanent functional loss of right arm but 100% permanent industrial impairment)).

¶17.    We have recognized that "where a permanent partial disability renders a worker unable to continue in the position held at the time of injury, . . . such inability creates a rebuttable presumption of total occupational loss of the member, subject to other proof of the claimant's ability to earn the same wages which the claimant was receiving at the time of injury." *City of Laurel*, 58 So. 3d at 1226 (¶15).  A presumption of total occupational loss arises "when the claimant establishes that he has made a reasonable effort but has been unable to find work in his usual employment, *or* makes other proof of his inability to perform the substantial acts of his usual employment."  *Id*. at 1226-27 (¶15) (emphasis added); *see also Jensen*, 828 So. 2d at 746 (¶16) (providing that a worker is entitled to receive the maximum scheduled benefits "where the injury prevents the worker from performing the 'substantial acts of his usual employment").   An employer can then rebut this presumption by showing "all the evidence concerning wage-earning capacity, including education and training which the claimant has had, his age, continuance of pain, and any other related circumstances." *Id.*

¶18.    Here, the Commission found that due Waits's arm and shoulder disability resulting from his injury, he was left "unable to return to his previous employ" and "unable to perform the substantial acts of his usual occupation."  Based on this finding, the Commission did not engage in an analysis of whether Waits established that he had made a reasonable effort to find work in his usual employment.  *See City of Laurel*, 58 So. 3d at 1226-27 (¶15)

7

(providing that a presumption of total occupational loss arises "when the claimant establishes that he has made a reasonable effort but has been unable to find work in his usual employment, *or* makes other proof of his inability to perform the substantial acts of his usual employment"). The Commission then determined that because Waits was unable to perform the substantial acts of his usual employment, he suffered a total occupational/industrial loss of a member. The Commission accordingly awarded Waits permanent partial disability benefits in the amount of $454.42 per week for a period of two hundred weeks, which the Commission explained was "illustrative of one hundred percent (100%) industrial loss of use relative to the right upper extremity." Mueller Industries maintains that the Commission erred in its definition of Waits's "usual employment" and frames its argument around the question of "whether Waits's usual employment was his employment at the time" of his injury.

¶19. When determining benefits, "[o]ur primary concern is whether the job at the time of injury is necessarily the usual employment." *Jensen*, 828 So. 2d at 747 (¶20) (internal quotation marks omitted). The supreme court provided guidance in the matter, defining "usual employment" as "the jobs in which the claimant has past experience, jobs requiring similar skills, or jobs for which the worker is otherwise suited by his age, education, experience, and any other relevant factual criteria." *Id*. The supreme court further stated that "'usual employment' is broader in scope than the job held at the time of the injury, and narrower than 'other employment' as contained in [section] 71-3-3(i)." *Id*.

¶20. Turning to examine the evidence before us, the record reflects that at the time of the hearing on June 14, 2017, Waits was 46 years old. At the hearing, Waits testified that he

8

began working at Mueller Industries in 2012, two years before his injury. Waits testified that after he fell at Mueller Industries and injured his right shoulder in November 2014, he underwent surgery and rehabilitation.

¶21. Dr. Van Osten is an orthopedic trauma physician who treated Waits on the day of his injury. Dr. Van Osten testified that Waits arrived at the emergency room on November 14, 2014, in extreme pain after falling and injuring his shoulder and arm. Dr. Van Osten testified that Waits suffered a complex injury to his shoulder that "was fairly unique, [with] several broken areas in the shoulder girdle, several different fractures that were all unique entities unto themselves." Dr. Van Osten explained that Waits had the worst kind of fracture, a four-part fracture of the proximal humerus, which is the upper part of the arm bone, that "exploded in several different fragments." Dr. Van Osten testified that Waits also had "a complex fracture of the coracoid, which is a bony protrusion out from the scapula, which serves as a little strut for attachment of several different soft tissue types of structures," which was shattered. Dr. Van Osten performed surgery on Waits on November 18, 2014, to reposition the fragments of the broken bone into their normal position.

¶22. Dr. Van Osten testified that he saw Waits several times after his surgery, including a post-op follow up on December 4, 2014, and a six-week post-op visit on January 8, 2015. Waits next presented to Dr. Van Osten on March 19, 2015. Dr. Van Osten testified that at that appointment, Waits expressed that he did not understand why he had been prescribed physical therapy and that he did not attend the first physical therapy session. Dr. Van Osten read into testimony the notes taken by his physician's assistant at that appointment. The notes reflected that Waits was advised of the importance of physical therapy and also advised

9

him to lose weight in order to help him achieve a greater range of motion in his shoulder. Dr. Van Osten explained that Waits was morbidly obese. Dr. Van Osten also testified that his physician's assistant gave Waits a work excuse, which stated that Waits could return to work with restrictions of no overheard lifting and no lifting greater than 30 pounds.

¶23. Dr. Van Osten saw Waits next on April 21, 2015. According to Dr. Van Osten, he had difficulty interpreting Waits's shoulder x-rays due to Waits's weight. At that time, Waits weighed 400 pounds. Dr. Van Osten testified that although everything appeared to be in place, Waits's shoulder x-ray also showed loosening of some of the screws "as well as some overall degenerations of the joint." Dr. Van Osten testified that he and Waits "discussed frankly and very openly the . . . reality of the situation, that he was probably going to not have a very functional shoulder, given the nature of the injury that he had experienced." Dr. Van Osten informed Waits that "his size really limited a lot of our options at that point." Dr. Van Osten opined that "there was always a possibility that [Waits] could continue to improve but that a lot of that would be up to him, you know, in the sense of taking care of himself overall and his health, but also in the sense of just continuing with an appropriate rehabilitation program or something like that."[4]

¶24. Dr. Van Osten testified that he felt Waits's results were "poor" overall, explaining:

> I think the number one factor was just the body -- his size, frankly, and -- and
> his general overall condition. And I think that I even mentioned at one point

---

[4] At the deposition, Dr. Van Osten reviewed Waits's medical records from Dr. Brent Lawrence at South Arkansas Orthopedics, who treated Waits in March 2016. Waits's attorney asked Dr. Van Osten if, after reviewing these new medical records, he would agree that "MMI at this point is kind of a fluid concept and we might wait to visit that." Dr. Van Osten responded, "Yes."

how the body habitus and the nature of the injury, of course, are interrelated. But those two things, the body habitus and the nature of the injury, I think, are . . . two of the most important things that led to his probably poor, you know, outcome. . . . I think the nature of the injury, the size and the body habitus of the patient, the difficulty of the surgery, the -- I think, frankly, you have to consider the fact that there was some miscommunication, for whatever reason, between [Waits] -- you know, [Waits], our office, my team, and potential the case manager; that for some reason, [Waits] seemed to have missed several therapy visits as well as follow-up appointments at certain intervals; so whatever the nature of that was and whatever the other issues surrounding his situation were with visits to behavioral health, I -- I can't speak to that or comment on that. But, certainly, I can -- there's one thing I know is that in situations where I have -- I treat a lot of complex injuries and in situations where I have seamless communication and well-structured follow-through plans, there tend to be better results[.]

¶25.    Waits underwent a Functional Capacity Examination (FCE) on May 5, 2015. Dr. Van Osten explained that he uses the services of Chan Brown from Crossroads Rehabilitation to perform FCEs and provide disability ratings. Dr. Van Osten reviewed Waits's FCE results and explained that Waits's impairment rating was 25% to the upper extremity equivalent to 15% to the whole person. Dr. Van Osten testified that based on his treatment with Waits, Waits reached maximum medical improvement on May 7, 2015. Dr. Van Osten then released Waits to return to work on May 12, 2015, with the following restrictions, which he based upon Waits's FCE results: no bending, no standing greater than 30 minutes, and no lifting with the right arm.

¶26.    The record reflects that Waits returned to work at Mueller Industries in May 2015 under the restriction of "light duty." Waits testified that his light duty constituted cleaning the plant, but that it was hard, heavy work that caused him pain in his shoulder. Waits testified that he was ultimately unable to continue to perform those duties when the severe pain in his shoulder returned.

11

¶27.    Travis Fisher, the human resources and safety director at Mueller Industries, testified that after his injury, Waits returned to work performing a light-duty type job. Fisher stated that Waits eventually approached him and asked if he could be placed in a forklift operator's job. Fisher testified that he placed Waits there per his request, and he stayed in that job for several months. Fisher testified that Waits seemed to be happy with his job. However, according to Fisher, in late 2015, Waits failed to call in or report to work for three days. Fisher explained that based on the point system set in place by the union contract, an employee is terminated when they reach seven points. Waits received six points for failing to call in or report to work for three days, and he had received a point prior to that. Because Waits reached seven points, he was terminated in December 2015.

¶28.    Waits testified that the pain in his shoulder returned in November 2015, he went to see a family doctor, Dr. Clint Washington, who placed Waits on FMLA and restricted him from working until Waits could get approved to see an orthopedist. Waits testified that while he was on FMLA leave, he called in to work every day. He explained, however, that it was his understanding that once he was approved to see an orthopedist, he no longer had to call in to work.

¶29.    Waits moved to Arkansas briefly after his termination from Mueller. Waits testified that he saw Dr. Brent Lawrence at South Arkansas Orthopaedics in March 2016. The record reflects that Waits's medical records from South Arkansas Orthopaedics were attached to Dr. Van Osten's deposition. The medical records reflect that on March 11, 2016, Waits presented to South Arkansas Orthopaedics with a chief complaint of right shoulder pain. Waits was diagnosed with "posttraumatic osteonecrosis of the right humeral head with

12

previous history of fixation of proximal humerus fracture." The medical records showed that Waits had "prominent hardware going into the glenoid," which was causing Waits "significant pain and limitations in motion."

¶30. Waits next received treatment from Dr. William Geissler at the University of Mississippi Medical Center on June 13, 2016. Dr. Geissler was accepted to testify via deposition as an expert in the field of orthopaedic surgery. Dr. Geissler testified that in June 2016, he diagnosed Waits with avascular necrosis to his proximal humerus and recommended shoulder surgery.[5] Dr. Geissler testified that he eventually performed a reverse shoulder replacement surgery on Waits in July 2016. Waits testified that after this surgery, the pain in his shoulder improved.

¶31. Waits underwent another FCE on January 31, 2017, and the results reflected that Waits suffered "Right upper extremity-Medium below shoulder level" and "Left upper extremity-Medium above and below shoulder level." Dr. Geissler stated that based on the FCE results, he released Waits for work with the following restrictions: Waits was cleared to "lift floor to waist 18 and a half pounds, waist to crown 15 pounds; front carry 16 pounds; carry 40 pounds on the right and 25 pounds on the left; push 52 pounds and pull 121 pounds." Waits was "restricted from overhead work on the right and overhead on the left for one-third of the day. . . . [and] restricted on the left shoulder for overhead one-third of the day." Dr. Geissler placed Waits at maximum medical improvement on February 13, 2017, and cleared him to return to work with the FCE restrictions. Dr. Geissler testified that, based

---

[5] Dr. Geissler also placed Waits off of work prior to the surgery, and he remained off of work until February 2017.

13

on a reasonable degree of medical probability, he opined that Waits has a 25% permanent partial medical impairment rating to his right upper extremity, and he did not believe that any further medical treatment was required. Dr. Geissler stated that the shoulder replacement he used on Waits was designed to "stay with him forever."

¶32.    Cristin Boyd performed Waits's FCE on January 31, 2017. Boyd reported that Waits gave maximal effort to all test items. According to the FCE, Waits demonstrated lifting ability within medium Department of Labor (DOL) category using both upper extremities below shoulder level, lifting ability within medium DOL category using left upper extremity above shoulder level, and excellent fine motor coordination. Waits demonstrated a lack of physical endurance and positional tolerance in standing and the inability to perform elevated work and overhead lifting with the right upper extremity. Boyd stated that she was unable to fully assess Waits's ability to return to work because a formal job description was not available. Boyd explained that Waits was not sure if he was still employed with Mueller Industries.

¶33.    Boyd stated that "dependent on job requirements, [Waits's] limitations in elevated work and overhead lifting may be a barrier to return to work. Also, [Waits's] limited endurance and positional tolerance to standing work and static standing may also be a barrier." Boyd found that Waits was a candidate for vocational rehabilitation. Boyd opined, "Based on client's verbal description of job requirements with Mueller, his physical abilities do not match job demands at this time. However, if client is no longer employed by Mueller, he has abilities within Medium [Department of Labor guidelines] lifting below shoulder level."

14

¶34. Waits's March 2, 2016 deposition testimony reflects that he graduated from high school and attended college for one year, but he did not graduate. Regarding his past employment, Waits testified prior to his job at Mueller Industries that he "had been in sales most of my life." He explained that he had "done heavy equipment operating and things like that from time to time, but mainly, I've been in sales my whole life." Waits stated that he worked as a singer and songwriter from 1991 to 1996. From 1996 to 2002, he worked as a financial services representative and application support coordinator at Alltel in Little Rock, Arkansas, where he mainly performed customer service work. Waits then worked as an assistant manager at McDonald's for two years. Waits testified that in his capacity as an assistant manager, he was required to do some hands on work and overheard lifting. After his job at McDonald's, Waits worked as a roofing contractor in Fort Worth, Texas for six years. As far as his duties as a roofing contractor, Waits explained that "he might clean up the yard a little bit, but I stayed off the roof except to map and measure. I basically sold and put in the jobs, made sure everything was done correctly." Waits testified that the only "factory work" he had ever done was at Mueller Industries. Waits testified that at the time of the hearing, he was working a part-time job picking up railroad crews and transporting them, and he earned $8 an hour.

¶35. Waits testified that he has a forklift license from Texas, but Waits stated Mississippi does not require a license. Waits also has a valid driver's license, but he does not have a commercial license. Waits further testified that he is right-hand dominant, but he cannot use his right hand after his injury. Waits explained that he no longer possesses knowledge of the current technology used in the application support field.

15

¶36. Fisher testified that after Waits was released at maximum medical improvement following his July 2016 surgery performed by Dr. Geissler, Waits asked Fisher if he could come back to work at Mueller Industries. Fisher explained to Waits that he had "pointed out" based on the point system and "had several write ups," so they would not be able to re-hire him. Fisher clarified that this decision had nothing to do with Waits's workers' compensation claim. Fisher also explained that the position of breakout operator no longer exists at Mueller Industries because it is a union contracted job, and with the most recent employment contract, "they did away with that particular position." Regarding jobs at Mueller Industries, Fisher testified that there were six job openings where the position requires lifting of no more than twenty pounds.

¶37. Daniel Turner was accepted as an expert in the field of vocational rehabilitation. Turner testified that he met with Waits in March 2017, and then he prepared a Vocational Rehabilitation Assessment in relation to Waits. In preparing his assessment, Turner reviewed Waits's deposition, his medical records, Waits's interrogatories and amended responses to interrogatories, as well as the documents produced by Waits in discovery.

¶38. In his assessment, Turner reported that Waits is right hand dominant, 5'8" tall and weighs 390 pounds. Turner stated that in the past, Waits had performed the following jobs:

> 1) roofing contractor, selling and managing roofing jobs, hiring and managing the crews, ordering materials, and subcontracting siding and painting; 2) assistant manager at McDonald's, including supervising employees in the restaurant and assuring the safe delivery of the food to customers; 3) Financial Services Representative at Alltel Financial Services, including working with customers to resolve billing issues and to collect past due accounts and working as an Applications Support Coordinator at Alltel, assisting retailers with technology questions and issues with the local area network and other computer problems, and; [4]) lead singer and songwriter in a band from 1991

through 1996. Claimant has also worked for short periods as a heavy equipment operator, a car salesman, a construction salesman and a delivery person.

¶39.    Turner identified 28 job listings suitable for Waits, all of which would allow Waits to work within his medical restrictions and use his transferrable skills. Turner opined that Waits has the opportunity to obtain employment and earn competitive wages in his labor market. Turner also opined that Waits could perform medium/light work. Turner stated that from his understanding, "there are jobs at Mueller [Industries]" that Waits "would have been able to do," even with his restrictions from Dr. Geissler.[6]

¶40.    On cross examination, Turner admitted that with workers' compensation cases, he does not send job listings to physicians and ask if the claimant would be capable of performing those jobs with his medical restrictions. Turner also admitted that the restrictions recommended by Dr. Geissler contradict the Depart of Labor's definition of medium duty. However, Turner stated that he had identified light and sedentary jobs for Waits.

¶41.    In her order, which the Commission summarily affirmed and adopted, the AJ stated that she reviewed Turner's vocation assessment updates for Waits. As stated, Turner opined that Waits had the opportunity to obtain full time employment in the labor market and earn

---

[6] We recognize that since the Commission did not make a finding on whether Waits established that he made a reasonable effort to find work in his usual employment, we will not engage in such analysis on appeal. The record reflects, however, that the Commission heard testimony from Turner stating that he reviewed Waits's initial job search and did not consider it to be a reasonable job search. Turner explained: "Well, this was back in 2016, and he had -- looked like he had applied for one, two, three, four, five, six jobs. And the reason I say it would not be reasonable is to me a reasonable job search is you're spending enough time in applying for jobs, for enough jobs to where you could reasonably expect it to obtain employment. And applying for six jobs in the year 2016, I wouldn't expect you to be able to obtain employment."

competitive wages.  The AJ found, however, that "upon a rigorous cross-examination [of Turner] and further information concerning these positions and what they actually entailed, it became obvious that [Waits] could NOT perform the substantial acts required by the majority of these listed jobs.  Further, [Waits] was NEVER offered a job of any kind."

¶42.    In examining relevant case law, we recognize that in *Jensen*, 828 So. 2d at 745 (¶12), the supreme court focused on "the extent of benefits Jensen can be awarded for permanent partial functional loss to his arm."  In that case, the Commission affirmed the AJ's finding of a 25% occupational loss of use of Jensen's left arm, notwithstanding this wage-earning capacity, and awarded benefits.  *Id*. at 743 (¶4).  Upon review, the supreme court found that Jensen "established, or very nearly established, that he could no longer perform the substantial acts of his actual employment at the time of his injury."  *Id*. at 749 (¶25).  However, the supreme court determined that "Jensen's claim for benefits for total occupational loss of his arm must fail . . . because of the Commission's finding, supported by substantial evidence, that Jensen suffered only a 25% occupational loss of use of the arm."  *Id*.  The supreme court explained that "[t]hat finding is supported by Jensen's work history, including his youth, his education, and the jobs held after his injury, which together demonstrated no loss of wage-earning capacity."  *Id*.  The *Jensen* court then expressed the following guidance:

> Where the occupational disability due to permanent partial loss of use of a scheduled member exceeds the functional or medical loss, the AJ and the Commission [must] properly look to the entire factual context to determine whether total occupational loss has occurred.  This necessarily goes beyond a literalistic interpretation of the "usual employment" test as applying solely to the job held at the time of the injury, regardless of the broader context. Common sense, our case law, and the policy behind the Workers'

18

> Compensation Law all support the holding that loss of wage-earning capacity is a factor in whether or not occupational disability is greater than the medical loss of use would indicate.

*Id.* at 750 (¶27).

¶43. We recognize that on appeal, we are limited to reviewing "whether the Commission's decision is supported by substantial evidence," and we will reverse the Commission's order "only where such order is clearly erroneous and contrary to the overwhelming weight of the evidence." *Weathersby*, 195 So. 3d at 882 (¶20). In reviewing the Commission's finding that Waits could no longer perform the substantial acts of his usual occupation, we keep in mind the supreme court's guidance that usual employment constitutes "the jobs in which the claimant has past experience, jobs requiring similar skills, or jobs for which the worker is otherwise suited by his age, education, experience, and any other relevant factual criteria." *Jensen*, 828 So. 2d at 747 (¶20). Here, Waits testified that prior to his job at Mueller Industries, he had "done heavy equipment operating and things like that from time to time, but mainly, I've been in sales my whole life." Waits stated that he worked as a singer and songwriter from 1991 to 1996. From 1996 to 2002, he worked as a financial services representative and application support coordinator, performing mainly customer service work. Waits then worked as an assistant manager at McDonald's for two years, where he was required to do some hands on work and overheard lifting. Waits also testified that he worked as a roofing contractor for six years, and explained that in performing his duties, "he might clean up the yard a little bit, but I stayed off the roof except to map and measure. I basically sold and put in the jobs, made sure everything was done correctly." Waits testified that the only "factory work" he had ever done was at Mueller Industries. Waits testified that

at the time of the hearing, he was working a part-time job picking up railroad crews and transporting them, and he earned $8 an hour.

¶44. After reviewing the evidence before us, and in keeping in mind our limited standard of review, we find that the record contains substantial evidence to support the Commission's finding that Waits could not perform the substantial acts of his usual employment, and that he therefore suffered a one-hundred percent industrial/occupational loss of use of his right upper extremity. The Commission correctly found that Waits met his burden of proving that he suffered a total occupational/industrial loss by showing that he could not perform the substantial acts of his usual employment. In its finding, the Commission acknowledged that wage earning capacity was not part of Waits's burden of proof, explaining that "a claimant is not required to make a work search to prove industrial loss of use of a scheduled member because he is not required to meet the test for loss of wage earning capacity in body-as-a-whole cases." *See City of Laurel*, 58 So. 3d at 1226-27 (¶15).[7] In the AJ's order, which the Commission summarily affirmed and adopted, she explained as follows:

---

[7] A claimant is not required to make a work search to prove an industrial loss of use of a scheduled member. *See Cole v. Ellisville State Sch.*, 59 So. 3d 612, 617 (¶24) (Miss. Ct. App. 2010). Additionally, a claimant is not required to make a work search because he is not required to meet the test for loss of wage earning capacity in body-as-a-whole cases: incapacity to earn wages in the same or other employment on the open labor market. *See id*; *McGowan*, 586 So. 2d at 167-68 (providing that claimant's inability to perform the substantial acts of his usual employment – climbing ladders and stairs, standing for long periods and carrying heavy loads – established as a matter of law that he had one hundred percent industrial loss of use of his leg although he had not attempted to return to work). We recognize that industrial loss of use is a narrower inquiry than loss of wage earning capacity, consistent with the expectation that workers with scheduled member injuries will return to work and are eligible for a maximum of only 200 weeks of benefits under the schedule. *See Jensen*, 828 So. 2d at 747-48 (¶¶20-22).

20

> The loss of use standard is applied and the claimant should be compensated for this loss of use for industrial purposes accordingly. Any effect on wage earning capacity is not a part of the calculation of the benefits and is not part of the burden of proof. Loss of wage earning capacity is not the legal standard to be applied.

As stated, the Commission based its determination of loss and award of benefits on its finding that Waits "is rendered unable to return to his previous employ, and he cannot return to that job should the circumstances permit as he is unable to perform the substantial acts of his usual occupation."

¶45. The Commission's finding that Waits's permanent partial disability rendered him unable to perform the substantial acts of his usual employment created a rebuttable presumption of total occupational loss of his right arm and shoulder. Therefore, "[t]he [next] question this Court must answer is whether [Mueller Industries] successfully rebutted the presumption of total occupational loss of the members with proof of [Waits's] ability to earn the same wages which [he] was receiving at the time of injury." *McDonald v. I.C. Isaacs Newton Co.*, 879 So. 2d 486, 490 (¶16) (Miss. Ct. App. 2004).[8]

¶46. To rebut the presumption of total occupational loss of Waits's right arm and shoulder,

---

[8] In *McDonald v. I.C. Isaacs Newton Co.*, 879 So. 2d 486, 490 (¶19) (Miss. Ct. App. 2004), this Court found that the employer failed to rebut the presumption that, as a result of her work-related injuries, the claimant no longer possessed the ability to earn the same wages that she was receiving at the time of her injury. This Court explained that at the hearing before the AJ the employer "offered no proof of its own that [the claimant] possessed the ability to earn the same wages she was receiving at the time of injury to rebut the presumption of total occupational loss of use of her upper extremities." *Id*. at (¶18). This Court acknowledged that evidence was presented showing that "there were other positions available for which [the claimant] was suitable[,]" but clarified that "the rebuttable presumption of total occupational loss of members created by [*Jensen*] must be overcome by proof of the claimant's ability to earn the same wages which the claimant was receiving at the time of injury." *Id*.

Mueller Industries bears the burden of showing "all the evidence concerning wage-earning capacity, including education and training which the claimant has had, his age, continuance of pain, and any other related circumstances." *Id.* Our review of the Commission's decision and order reflects that the Commission did consider the evidence presented by Mueller Industries relevant to their burden of showing "all the evidence concerning wage-earning capacity, including education and training which the claimant has had, his age, continuance of pain, and any other related circumstances." *McDonald*, 879 So. 2d at 490 (¶16). In its order, the Commission recognized that wage earning capacity, medical evidence, and other vocation and industrial factors were relevant, as evidenced by the following finding: "Also of note, the claimant is right hand dominant, is 46 years of age, has a high school education, has worked in production, and has been unable to return to work and earn wages since his work injury." The Commission also stated that it had considered the evidence presented, including "all testimony, lay and medical." The record reflects that the Commission considered all of the evidence presented by Waits and Mueller Industries in finding that Waits suffered a total occupational/industrial loss and in further determining that this finding was not rebutted by the medical evidence, wage earning capacity, and vocational factors presented. We therefore find that the Commission's decision is supported by substantial evidence, and we affirm.

## II. Showing of Partiality

¶47. Mueller Industries next argues that the AJ erred by showing partiality in favor of Waits as exhibited by her actions prior to the full administrative hearing. Mueller Industries claims that, prior to the administrative hearing, the AJ held a settlement conference with

counsel for both sides at which time the AJ "informed both counsel that the case should be settled" for one hundred percent permanent partial disability benefits. Mueller Industries asserts in its appellate brief that "it was obvious" from the AJ's discussion regarding settlement that the AJ "had already made up her mind on the value of the case before hearing all of the testimony, vocational evidence, and medical evidence." Mueller Industries also claims that the AJ "appeared very upset" that settlement could not be agreed upon for payment of one hundred percent permanent partial disability benefits.

¶48.    As Waits asserts in his appellate brief, Mueller Industries fails to provide any evidentiary support for its assertions against the AJ. This Court cannot consider evidence outside of the record. *Hardy v. Brock*, 826 So. 2d 71, 76 (¶26) (Miss. 2002). We also recognize that the failure to cite relevant authority prevents the appellate court from reviewing an issue; therefore, this issue is procedurally barred. *Byrom v. State*, 863 So. 2d 836, 863 (¶84) (Miss. 2003); *Bridges v. Kitchings*, 820 So. 2d 42, 49 (¶27) (Miss. Ct. App. 2002).

¶49.    **AFFIRMED.**

   **BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**