ON MOTION FOR REHEARING
BRANTLEY, J.,
for the court.
¶ 1. The motion for rehearing is granted and the original opinion is withdrawn and this opinion is substituted therefor.
¶ 2. Once again, this Court is faced with the scheduled member issue as it relates to, among other things, the interpretation of what is the usual employment of a claimant at the time of injury. The claimant contends that the Mississippi Workers’ Compensation Commission’s award of twenty-five percent permanent occupational disability to each hand was error as a matter of law because it considered irrelevant evidence. We reverse and remand this case to the Commission for further proceedings consistent with this opinion.
¶ 3. On appeal to this Court, Ard presents the following issues:
I. WHETHER THE COMMISSION ERRONEOUSLY APPLIED AN INCORRECT RULE OF LAW IN ITS AWARD.
II. WHETHER THE AWARD OF THE COMMISSION WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.
III. WHETHER THE AWARD OF THE COMMISSION WAS ARBITRARY AND CAPRICIOUS.
IV. WHETHER THE COMMISSION ERRONEOUSLY APPLIED THE CONCEPT OF LOSS WAGE EARNING CAPACITY TO A SCHEDULED MEMBER CASE.
V. WHETHER THE COMMISSION ERRONEOUSLY REDUCED THE CLAIMANT’S LOSS OF INDUSTRIAL USE OR PERMANENT OCCUPATIONAL DISABILITY BASED ON A SHOWING THAT THERE WERE OTHER JOBS, UNRELATED TO THE CLAIMANT’S EMPLOYMENT AT THE TIME OF THE INJURY, FOR WHICH THE CLAIMANT MIGHT BE QUALIFIED.
VI. WHETHER THE COMMISSION ERRONEOUSLY WROTE AN AWARD SUBJECT TO MULTIPLE INTERPRETATIONS AS TO WHAT MIGHT HAVE BEEN AWARDED.'
VII. WHETHER THE CIRCUIT COURT ERRED IN AFFIRMING THE COMMISSION.
VIII. WHETHER THE CIRCUIT COURT ERRED IN NOT AMENDING OR REMANDING THE AWARD OF THE FULL COMMISSION TO BE AMENDED TO CLEARLY REFLECT EXACTLY WHAT BENEFITS WERE AWARDED.
IX. WHETHER, BECAUSE THE COMMISSION ERRONEOUSLY APPLIED AN INCORRECT RULE OF LAW IN ITS ORDER, THE COURT OF APPEALS SHOULD ISSUE AN ORDER DE NOVO IN RULING ON THIS APPEAL, DECIDING WHAT AMOUNT OF PERMANENT DISABILITY TO WHICH THE CLAIMANT WAS ENTITLED FOR THE INJURIES TO HER HANDS, WRISTS AND ARMS.
FACTS
¶ 4. Barbara Ard was employed by Marshall Durbin on two separate occasions. The most recent employment of Ard was for a year. Ard was employed as a chick *1242 en breast trimmer, also a deboner, a packer, and a hanger. As a deboner, she stood at a conveyor belt and trimmed the excess fat and skin off the deboned breasts. Ard was located at a small work station and she would use scissors to trim the meat. In order to complete this task, Ard would reach out with both hands to pull the meat onto the work area, and she would then take scissors in her right hand and trim the meat as she held it in her left hand. Ard would then throw the meat across the conveyor belt with her left hand. Ard would repeat this task throughout her workday.
¶ 5. Ard was also a packer which required her to stand next to a conveyor belt. At eye level, there were stacks of styrofoam trays, and at waist level there was chicken meat on the belt. She would reach up with both hands to eye level to pick up the trays. Ard would place the trays onto the waist level station and then use both hands to grab the meat and place it on the trays. She would repeat this task throughout her workday.
¶ 6. In addition to working as a trimmer and a packer, Ard would also hang breast fronts on a cone belt. In order to complete this job, she would pass the breast front from her left hand to her right hand and then place the breast on a cone. She would repeat this throughout her workday.
¶ 7. On January 17,1997 Ard sustained a work-related injury to both hands, wrists and arms. The employer admitted the compensability of the injury, provided medical services and supplies, and paid approximately $8,410.92 in temporary total disability benefits and $3,355.20 in permanent partial disability benefits, totaling approximately $11,766.12.
¶ 8. Ard left Marshall Durbin in order to have surgery on her hands. Dr. Alan Freeland did a carpal tunnel release on each hand, the right on January 12, 1998, and the left on May 18, 1998. Before she was to be released from medical treatment, the employer sold its plant to Peco Foods. Ard testified that she called Peco Foods to see if she could get her old job back, but the personnel manager said the company did not take back anyone from Marshall Durbin.
¶ 9. Ard looked for employment at various places, such as the United States Post Office, Tower Loan, Esco’s Insurance, Dollar General Store, Madison County Medical Center, Bill’s Dollar Store, Department of Human Services, the Mississippi Cooperative Extension Service, Canton Sales & Storage, the Housing Authority of Canton, and the Madison County Library, all in Canton, and Michael’s Arts & Crafts, Stein Mart, and East Ford in Jackson. She found work at Wright’s Security Services in Jackson as a security officer, and her primary job duty was to patrol stores. Ard earned $5.35 an hour and worked about thirty hours a week. Ard had trouble with one of her knees and had to quit this job.
¶ 10. After the two surgeries, Ard complained of pain and swelling in her hands. Furthermore, Ard complained of pain when she uses scissors, can openers, knives, screwdrivers, or pliers. Ard claims that she cannot open a mayonnaise jar, and she has difficulty with certain door knobs. Ard states that she can write only about half a page without having pain or swelling, and she has trouble driving more than an hour at a time. Her hands ache and feel like needles are sticking in them. Buttoning buttons, tying shoe laces, and combing her hair cause her problems because she has trouble gripping things.
¶ 11. Sam Cox, vocational rehabilitation consultant in Jackson, testified for the employer that he prepared a vocational rehabilitation report on the claimant, dated October 27, 1999. Cox reviewed the notes of the rehabilitation case manager at Comp- *1243 Care, various medical records of Dr. Free-land and Dr. Myers, Ard’s application to Wright’s Security Services, and other records. Cox concluded that Ard was employable. He did a labor market survey and found jobs within her restrictions, such as desk clerk, data entry operator for people registering in a hotel, telemarketer, dispatcher, security guard, and sales clerk. He noted the unemployment rate in Rankin County is 2.1%, in Madison County, 3.2%, and in Hinds County, 4.0%. Mr. Cox said Ard could earn at least minimum wage, $5.15 an hour, and up to $6.00 or $7.00 an hour.
¶ 12. Mr. Cox said sedentary work requires the ability to lift ten pounds and carry ledgers or other items weighing less than ten pounds and to sit six hours a day. Light-exertion work is being able to lift twenty pounds and carry ten pounds. Mr. Cox reviewed Dr. Freeland’s restrictions and classified Ard’s work level within his restrictions to be sedentary. Mr. Cox testified that 30% of the types of jobs in Mississippi are sedentary jobs.
¶ 13. The medical records of Dr. Mitchell J. Myers, neurologist in Jackson, were received into evidence. Dr. Myers did a nerve conduction study on Ard on January 30, 1997, finding bilateral median neuropa-thy at the wrist, supporting a diagnosis of bilateral carpal tunnel syndrome of moderate severity. He did another nerve conduction study on May 22, 1997, noting improvement since the study of January 30, 1997. Ard returned to see him July 10 and 31, 1997, stating that she continued to work.
¶ 14. On August 14, 1997, Dr. Myers wrote that Ard was under his care for treatment of tendinitis and myofascial pain. He recommended she stay off work for two weeks to undergo physical therapy. On August 28, 1997, Dr. Myers said Ard was to remain off work until September 4, 1997, and return to see him September 8, 1997. On September 8, 1997, Dr. Myers referred Ard to a rheumatologist. He suggested she have a light duty assignment that did not require exposure to cold nor any repetitive motion tasks.
¶ 15. The medical records of Dr. Alan Freeland, an orthopaedic hand specialist at the University Medical Center in Jackson, were received into evidence. Dr. Freeland first saw Ard on September 25, 1997, for complaints of bilateral hand and wrist pain from a work injury of January 17, 1997. Ard reported that she wore braces on her wrists at night. Dr. Freeland diagnosed bilateral carpal tunnel syndrome with possible cold intolerance and vasospasm. He asked her to continue wearing the wrist splints, have a cold intolerance test, and come back to see him in three weeks.
¶ 16. Ard returned to see Dr. Freeland on October 16, 1997, telling him she had not had any relief wearing the splints. The cold tolerance test was positive for peripheral vasospastic disease. EMG and nerve conduction studies in January and May 1997 indicated moderate bilateral carpal tunnel syndrome. Dr. Freeland recommended surgery, right side first.
¶ 17. Ard underwent the surgery on January 12, 1998, and returned to see Dr. Freeland for follow up. On February 19, 1998, Dr. Freeland started her on a daily home program of strengthening, conditioning, and edema and scar management. Dr. Freeland referred her to Dr. Rahul Vohra at the Mississippi Methodist Rehabilitation Center for therapy for her right hand.
¶ 18. Ard underwent the left carpal tunnel release on May 18, 1998, and Dr. Free-land followed her for several visits after the surgery. On July 9, 1998, Dr. Free-land advised a daily home therapy program to recover motion, strength, power, and endurance.
*1244 ¶ 19. Dr. Freeland saw Ard again on August 14, 1998, noting she was three months following her most recent surgery. He noted he had done everything he could for her, although she was still having intermittent activity-related swelling and some cold intolerance. He ordered a residual functional capacity test and asked her to return in a month. He continued her on a therapy program for strengthening and conditioning. The functional capacity test was completed and the evaluation summary report of the Human Performance Center in Ridgeland was attached to Dr. Freeland’s records. The therapist noted Ard demonstrated consistency of performance and maximum effort on the tests. The therapist noted that there were no overt pain behaviors. The therapist concluded that Ard had significant deficits in strength, endurance and manipulation of both arms and handling of objects. He said her physical abilities did not match the description of her job at Marshall Dur-bin/Peco Foods, and he did not believe her job could be modified to allow her to return. He recommended a progressive work hardening and endurance program.
¶ 20. Dr. Freeland released Ard as having reached maximum medical improvement on September 17, 1998. He assigned a five percent permanent partial impairment to each hand solely as a result of the residuals of her carpal tunnel syndrome injury and resulting surgery.
¶ 21. The administrative law judge awarded Ard temporary total disability benefits at the rate of $186.39 per week beginning January 17, 1997, and continuing until September 17, 1998, and permanent partial disability benefits at the rate of $186.39 per week beginning September 18,1998, and continuing for a period of 165 weeks, with credit for all such payments already made by the employer, all medical services and supplies required by the nature of Ard’s injuries, and penalties and interest on any due and unpaid compensation benefits. The Commission affirmed the administrative law judge’s findings and conclusions with one exception. The administrative law judge concluded that Ard sustained a fifty-five percent occupational disability to each hand as a result of the injury. However, the Commission reduced the award to twenty-five percent occupational disability to each hand. The Circuit Court of Madison County affirmed the Commission.
STANDARD OF REVIEW
¶ 22. A judicial body reviewing an action of the Mississippi Workers’ Compensation Commission has certain limitations imposed on the scope of its inquiry. The court must give substantial deference to the factual determinations of the Commission and affirm if there is substantial evidence in the record to support the Commission’s findings. General Elec. Co. v. McKinnon, 507 So.2d 363, 366 (Miss.1987). However, a reviewing court is further charged with determining whether there has been an error of law by the Commission, and, as to such an assertion, there is no obligation to afford the Commission’s decision any deference. Metal Trims Indus., Inc. v. Stovall, 562 So.2d 1293, 1296-97 (Miss.1990). Rather, our judicial review of errors of law is de novo. The case before us is framed as an issue of law since the contention is that the Commission erred in considering matters that, under prevailing law, had no bearing on the determination of the extent of Ard’s occupational disability.
DISCUSSION
¶ 23. We address all of Ard’s issues together as these issues are, to some extent, intertwined. Furthermore, the main issue presented in this appeal is the extent of the claimant’s occupational dis *1245 ability to her scheduled members. Our workers’ compensation statutes guarantee a measure of compensation to an injured worker who suffers a permanent impairment to a scheduled member as the result of a work-related injury. See Miss.Code Ann. § 71-3-17(c) (Rev.1995). A hand is a scheduled member as contemplated by this statute. See Miss.Code Ann. § 71-3-17(c)(3) (Rev.1995).
¶ 24. At the outset of any proceeding to determine the proper level of compensation for an injury to a scheduled member, there are two basic avenues of approach. The claimant may assert a claim that, by virtue of the residual effects of her injury, she is incapable of obtaining any form of gainful employment and that, as a result, she is entitled to 450 weeks of compensation under Section 71-3-17(a) of the Mississippi Code. Miss.Code Ann. § 71-3-17(a)(Rev.2000); Smith v. Jackson Constr. Co., 607 So.2d 1119, 1128 (Miss.1992). If the claimant does not claim total industrial disability, a scheduled member injury entitles her to appropriate compensation based on the degree of permanent partial disability suffered to the member. Miss.Code Ann. § 71-3-17(c) (Rev.2000).
¶ 25. One of the principal features of a disability claim under Section 71-3-17(c) is that the award is based solely on the degree of disability to the scheduled member and does not take into account the effect of that disability on the claimant’s actual ability to earn wages in her post-injury condition. Smith, 607 So.2d at 1125-26. This stands in contrast to a claim of total disability under Section 71-3-17(a), for which the claimant must prove she is unable to engage in any form of gainful employment. Id. at 1127-28.
¶ 26. The Commission found that Ard proved an industrial loss of use of the right hand of twenty-five percent and an industrial loss of the use of her left hand of twenty-five percent. The Commission affirmed the administrative law judge with exception to the percentage of loss. There is uncontradicted medical and lay evidence that supports the proposition that Ard’s injuries prohibit her from performing the typical duties of her employment on a poultry processing line.
¶ 27. Dr. Freeland stated that:
Although the Human Performance Center has recommended a period of work hardening and strengthening endurance program, it is my opinion that this is not going to get the patient back to her previous job. I do not think that this will change her work status and consequently we are not going to pursue that at this time. Her Residual Physical Capacity Test demonstrates that she is disabled from the job that she was doing at the time that she was injured. I feel that her work is going to be restricted to light work from 0 to 10 pounds pushing, pulling, lifting, carrying, pinching and grasping. She may not be able to do all the jobs in that range. She may have to work toward the lower end of that range. She is restricted from climbing, working at heights, consistent overhead work, continuous work with the arm extended, vibration, impact activity such as hammering, and use of high torque tools such as wrenches or screwdrivers. The repetitive forceful pinching and grasping such as production, assembly line, machine, factory, and keyboarding, as well as other skilled labor may have to be determined in relation to her Residual Physical Capacity testing.
(emphasis added). The functional capacity evaluation summary attached to Dr. Free-land’s records stated that her physical abilities did not match the description of her job at Marshall Durbin, and that he did not believe her job could have been modified to allow her to return.
*1246 ¶ 28. Again, the evidence is uncontra-dicted that Ard cannot do the substantial acts of her employment with or without any modification with Marshall Durbin. As a result of the injury, Ard is now incapable of performing any of the substantial acts of her employment at the time of the injury or any other relevant jobs with Marshall Durbin.
¶ 29. At the time of the hearing, the Commission found that Ard was working part time as a cashier and that she could earn minimum wage in other employment. Pete Mills, a vocational rehabilitation therapist, testified about Ard’s education, training, and past work experience. He also testified about job openings which he felt Ard could fill based upon the restrictions presented by Dr. Freeland and confirmed by the Functional Capacity Exam.
¶ 30. We conclude that the Commission clearly erred when it based its ruling on the potential post-injury wage earning ability of Ard. This Court has consistently held that the degree of disability to a scheduled member does not consider the effect of that disability on the claimant’s potential post-injury ability to earn wages in her post-injury condition. Smith v. Jackson Constr. Co., 607 So.2d 1119, 1125 (Miss.1992). The supreme court also stated that if the claimant is unable to do the substantial acts of the employment in which he was engaged when injured, he has produced evidence sufficient as a matter of law to show that the partial impairment had the effect of total loss of use. Bill Williams Feed Service v. Mangum, 183 So.2d 917, 920 (Miss.1966). Mangum obviously involves facts strikingly similar to those in this case and provides further support and precedent for this Court’s ruling in this case. Finally, Mangum further provides closure to the theory that the prior range of jobs with other employers can be classified as part of her usual employment at the time of the injury.
¶ 31. This case is reversed and remanded to the Commission with instructions for the Commission to determine the total amount of permanent partial benefits due based upon 150 weeks for each hand, less any credits previously paid, plus penalties and interest on any due and unpaid compensation benefits.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, P.J., BRIDGES, LEE, IRVING, AND MYERS, JJ., CONCUR.
SOUTHWICK, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., THOMAS AND CHANDLER, JJ.