# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-WC-00199-COA

**MTD PRODUCTS, INC. AND MTD PRODUCTS, INC. D/B/A MODERN LINE PRODUCTS COMPANY**                    **APPELLANT**

**v.**

**BRENDA MOORE**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/14/2023 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEY FOR APPELLANT: | GINGER MOORE ROBEY |
| ATTORNEY FOR APPELLEE: | ROBERT EARL MONTGOMERY IV |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 01/16/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND SMITH, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.    MTD Products Inc. appeals the award of permanent partial disability benefits of $460.36 per week for a period of 50 weeks as a result of Brenda Moore's work-related injury to the upper extremity of her left arm. MTD Products claims that the Administrative Judge, and the Mississippi Workers' Compensation Commission by affirmance, erred by finding that Moore suffered a 25% occupational impairment when her medical impairment was 14%.

¶2.    Substantial evidence supports the Commission's finding that Moore suffered an occupational disability of 25%, thus exceeding her medical disability of 14%. As a result, the Commission's award to Moore of permanent partial disability benefits at a weekly rate of $460.36 for 50 weeks was not arbitrary or capricious, and we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶3.     Before working for MTD Products, Brenda Moore operated a band saw at Thor Manufacturer in Houston, Mississippi. She left there to become a loader at Ashley Furniture Store. Her job at Ashley Furniture consisted of loading parts onto a buggy. But in 2007, she began working at MTD Products as a temp through Hamilton Ryker. She did this for approximately two years. Thereafter, she began studying nursing at a community college but did not finish. Instead, she completed her college education with an associate's degree in general studies. In 2014, she returned to working part-time at MTD Products as a temp. This led to her becoming a full-time robot operator for MTD Products, making an average weekly rate of $690.20.

¶4.     Moore, who was a fifty-five-year-old female and right-hand dominant, did well on the job and was considered to be in the top 5% of employees in her unit. Her station area was between two machines and one of her job duties, as "an assembler in injection molding," included maintaining her station area. On March 10, 2021, Moore began her usual shift from six in the morning to six in the evening, like any other. When she arrived, she noticed that in her area there were large boxes taking up space. Because the boxes were not supposed to be there, she began removing cardboard from one of the large boxes. At this moment, as she was pulling out the cardboard, Moore tripped and lost her balance. When she tried to catch herself by placing her hands behind her back, she fell onto the floor, causing her to fracture her left elbow.

¶5.     Two days later, Dr. William Pillow performed surgery on Moore's arm to "repair

2

lateral collateral ligament, left elbow, and arthroplasty radial head left side." Post-surgery, Moore visited Dr. Pillow on multiple occasions beginning March 22, 2021, until he released her on December 22, 2021. During this time, Dr. Pillow documented the visits, along with his findings through work status reports and medical reports. On March 22, 2021, Dr. Pillow recommended that Moore undergo physical therapy and checkmarked the "cannot work" box on her work status report. On April 5, 2021, Dr. Pillow wrote she was recovering well from the surgery but that she still could not use her "affected extremity." On April 25, 2021, Dr. Pillow maintained that Moore could not use her "left arm."

¶6. It was not until May 24, 2021, that Dr. Pillow permitted Moore to return to work. However, this work status report stated that she would return to work "with restriction." She was not to lift anything more than ten pounds, and she could not push or pull. The next day Moore filed a petition to controvert alleging that she had a compensable injury. On June 14, 2021, MTD Products filed its answer, stating that Moore had received temporary total disability benefits from MTD Products.

¶7. While the controverted claim was underway, Moore continued to see Dr. Pillow. On June 28, 2021, Dr. Pillow wrote that Moore complained of pain in her elbow but stated that she could return to work "without restriction." On September 27, 2021, Moore returned and complained of "numbness in her ring and small finger that increase[d] with elbow motion." There was no change in her work status. But when Moore visited Dr. Pillow on November 24, 2021, Dr. Pillow returned Moore to work "with restriction," stating that she could not lift more than five pounds and, once again, that she could not push or pull.

¶8.    On December 22, 2021, Moore had her last visit with Dr. Pillow.  At this time, Dr. Pillow wrote that she did not have any long-term restrictions and that he was returning her to full-duty work "without restriction."  He further wrote that he was ordering an impairment test.  On January 17, 2022, Dr. Pillow gave Moore an impairment rating of 14% in her upper extremity, "which equal[ed] an 8% whole person impairment."

¶9.    On February 8, 2022, MTD Products filed a written agreement stating that Moore was entitled to permanent partial compensation for the 14% loss of her arm at the rate of $460.13 per week for twenty-eight weeks, starting from December 22, 2021.  On March 2, 2022, Moore filed her pre-hearing statement, acknowledging that she received disability benefits from MTD Products from March 11, 2021, to November 30, 2021.  On March 8, 2022, MTD Products filed its pre-hearing statement, which confirmed that it had paid Moore disability benefits from March 11, 2021 to June 1, 2021, and from November 16, 2021, to November 30, 2021.  According to Moore's pre-hearing statement, it had paid Moore based on the 14% impairment rating given by Dr. Pillow.  Based on the rating, Moore received a check in the amount of $12,883.64.

¶10.    MTD Products' pre-hearing statement contained an attachment listing the stipulations the parties had agreed to.  A list of the stipulations was later repeated by the AJ:

1.    Moore suffered a compensable left upper extremity injury on March 10, 2021.

2.    All temporary total disability benefits owed to date have been paid.

3.    Twenty-eight weeks of permanent partial disability benefits have been paid at the compensation rate of $460.13 weekly.

4

4.      Moore underwent surgical repair of the later collateral ligament in her left elbow and arthroplasty of the radial head on the left side by Dr. William Pillow on March 12, 2021.

5.      Moore was placed at maximum medical improvement on December 22, 2021, and was assigned a 14% impairment rating of the upper extremity by Dr. Pillow.

6.      Moore had a pre-injury average weekly wage of $690.20.

7.      There is no current dispute over medical treatment.

Despite the stipulations, the parties continued to dispute the "extent of [Moore's] permanent disability, and [the] industrial loss of use in excess of [her] medical impairment rating, if any." Thus, on July 20, 2022, the AJ held a hearing on the matter, where Moore and her employment supervisor Bob Scott testified.

¶11.    According to Scott, Moore's normal job was to work on "two machines that [ran] together" on an assembly line. One machine produces the part that would come down a conveyor belt. Scott stated that Moore was responsible for checking the parts when each part came down the belt. If there was "excess plastic" on the part, MTD Products expected Moore to "trim" the plastic. The plastic parts would then be placed in a container sized at about ninety inches.

¶12.    Scott clarified, however, that there were no "set" jobs in Plastics, and that on any given shift any worker could be placed at any machine. In this sense, Scott referred to Moore and any other employee under his supervision as a "floater." This meant that a person would have to "fill-in" a spot on the assembly line when another person slated for the position had to take a break. Similar to other jobs performed on shift, the number of floaters needed for

5

each shift varied day-by-day.

¶13. Before Moore's injury, Scott said that he would place her in any position he needed for her to work. For example, prior to Moore's injury, she was being trained to use MTD Products' "baffling" part of the machine that produced plastics. As the highest-producing machine, Scott explained that this machine had four different applications. And because there were four applications, Scott also said that he typically assigned four people to work on the machine. But one application in particular, the pushing and pulling application, would not necessarily be assigned to Moore all the time.

¶14. Scott said that Moore never had any problems working on the "baffling" part of the machine. Scott further testified that once Moore returned to work post-injury he did not observe her having trouble completing any of her tasks. When she returned to work on restrictive duty the first time, he was involved in deciding which duties and tasks met Moore's restrictions. Scott speculated that he "probably asked [Moore] [if] she was capable" of doing certain things or "comfortable" doing things and she must not have had any problem with it. He also said that Moore never refused to do any work that he asked of her and that he never had any issues with her work performance. He stated that she was no longer working on the "injection molding" machine because that machine was no longer in operation.

¶15. At the same time, Moore testified that she was no longer being cross-trained on the baffling machine post-injury because when she returned to work on restrictive duty, she could not perform the task. Moore began by explaining that baffling was

when you have to put a part inside the machine. You just push it in with both hands and make sure you have to - - I mean, they have little doors you put in - - you put it in. And - - and the machine - - when the machine puts the rod through it, you have to use force to pull it out.

She then stated that on one particular shift she was a floater and was assigned to the baffling machine while the worker initially assigned to the machine went on break. Moore testified that she could not pull the parts out of the machine or place the parts inside of the machine because when she "push[ed], it [felt] like . . . a jerk in [her] arm." As a result, "the machine was still dropping a lot of parts and [she] wasn't able to keep up with [the machine]." When the lead worker on the shift, Tyanna Jones, saw that Moore could not keep up, she told Moore that "she would do that job," and in turn, Moore was assigned to another job.

¶16.   Moore further testified that she can no longer perform her job duties in the same manner. First, prior to her injury she was able to move boxes "as wide as a table" but post-injury, she has to get someone to help her. Second, Moore testified that she was no longer able to push boxes with her left arm and that she has to use her right arm instead. Moore also said that she could not put the requisite tops on the boxes because she could not lift them with one hand, as the tops were about three feet long and two inches thick.

¶17.   She stated that she was not able to fully extend her arm anymore and that she had trouble putting parts inside the machine. Instead of putting springs inside the door of the machine like she used to, she testified that she had to use a screwdriver to press the springs in. Third, Moore testified that she was not able to push the buttons on the machines with her left hand and that she has to push the buttons with her right hand.

¶18.   Moore further testified about another instance when Tyanna had to help her because

7

she could not perform the task by herself. In this instance, one of the machines had run out of labels for the parts. Moore tried to press a button for the machine to come down with her left hand but she could not place enough pressure on the button. Thus, Tyanna had to climb up onto the machine to replace the labels. And when Tyanna asked for Moore to turn the machine back on, Moore had to push the button with her right hand.

¶19. Moore also testified about the continual pain she felt after her surgery and the problems she continued to have in her personal life. Moore said that she sometimes felt sharp pains in her arm that would cause her to stop what she was doing at work and wait until the pain subsided. She said she had trouble picking things up with both of her hands. She also stated that at home she used a handicap device called a shipper to put her socks and shoes on. Lastly, she had trouble sleeping at night because of the pain in her arm. To alleviate some of the pain, she has had to put pillows down her side and underneath her arm.

¶20. On October 26, 2022, the AJ entered an order explaining that the sole issue for resolution was the existence of permanent disability and whether the industrial loss of use was in excess of the medical impairment rating, if any. The AJ found that "Moore [was] able to perform the substantial acts of her usual employment in the plastics area, but she has had to personally make some accommodations to how she works." The AJ ultimately found "based upon the evidence as a whole" that Moore suffered a 25% industrial loss of use to her left upper extremity. The AJ relied on the fact that Moore credibly testified to still having severe pain and problems using her left arm to push buttons or lift things. In the AJ's opinion, this testimony was corroborated by the medical evidence documented by Dr. Pillow.

As a result, the AJ ordered MTD Products to pay permanent partial disability benefits to Moore at the rate of $460.36 per week (two-thirds of $690.20) beginning December 22, 2021, and continuing for 50 weeks.

¶21. Due to the agreement previously made between the parties, MTD Products had already paid Moore for twenty-eight weeks beginning December 22, 2021, at the rate ordered by the AJ. In effect, the AJ's order would require MTD Products to pay Moore for an additional twenty-two weeks. In other words, there are three differences between what MTD Products had agreed to before the hearing and the final order: (1) the industrial loss of use was greater than the 14% medical impairment by 11%; (2) because of this difference, Moore was entitled to 50 weeks of compensation instead of 28 weeks; and (3) the weekly rate was $460.36 rather than $460.13. As a result, MTD Products petitioned the Commission for a review of the AJ's decision, asserting that substantial evidence did not support the AJ's decision and that the AJ erred by finding that Moore suffered an industrial loss greater than her medical impairment. On February 14, 2023, the Commission affirmed the AJ's order without opinion. MTD Products appeals from the Commission's order for the same reasons.

## STANDARD OF REVIEW

¶22. When "the Commission's decision is supported by substantial evidence, . . . it must be upheld," even if "we might have reached a different conclusion were we the trier of fact." *Howard Indus. Inc. v. Hardaway*, 191 So. 3d 1257, 1267 (¶27) (Miss. Ct. App. 2015); *Parker v. Ashley Furniture Indus.*, 164 So. 3d 1081, 1083-84 (¶11) (Miss. Ct. App. 2015) (quoting *Smith v. Johnson Tombigbee Furniture Mfg. Co.*, 43 So. 3d 1159, 1164 (¶15) (Miss. Ct. App.

9

2010)). "Substantial evidence [means] more than a "mere scintilla" of evidence, but it does not rise to the level of "a preponderance of the evidence." *Prairie Farms Dairy v. Graham*, 270 So. 3d 37, 41 (¶10) (Miss. Ct. App. 2018) (citing *Harper ex rel. Harper v. Banks, Finley, White & Co. of Miss. P.C.*, 167 So. 3d 1155, 1162 (¶17) (Miss. 2015)). "Because the Commission serves as [the] ultimate fact-finder and judge of the credibility of witnesses, we may not reweigh the evidence that was before the Commission." *Prairie Farms*, 270 So. 3d at 41 (¶10) (citing *Pruitt v. Howard Indus. Inc.*, 232 So. 3d 822, 825 (¶7) (Miss. Ct. App. 2017)).

## DISCUSSION

¶23. The question is whether the AJ's finding (affirmed by the Commission) of 25% occupational impairment, which was greater than the 14% medical impairment rating given by the physician, was arbitrary and capricious or not supported by substantial evidence. But before diving into a discussion of the present case, it is pertinent to briefly summarize the surrounding workers' compensation law on this matter and its terminology for a better understanding of the particularized issue on appeal.

### I. Applicable Law

¶24. "The Mississippi Workers' Compensation Act compensates for both permanent total disability and permanent partial disability (scheduled-member)." *City of Laurel v. Guy*, 58 So. 3d 1223, 1225-26 (¶9) (Miss. Ct. App. 2011) (citing Miss. Code Ann. § 71-3-17 (Rev. 2000)). The compensation for "permanent total" versus the compensation for "permanent partial" benefits are different from one another because when a claimant suffers permanent

10

total disability, the statute allows for the claimant to receive up to 450 weeks of compensation. *Id*.; *see* Miss. Code Ann. § 71-3-17(a). But when a claimant suffers permanent partial disability, the statute allows for the claimant to receive equal to or less than 200 weeks of compensation, depending on the injured scheduled member (body part). *Guy*, 58 So. 3d at 1225 (¶10); *see* Miss. Code Ann. § 71-3-17(c). The Legislature distinguishes the compensation a claimant is entitled to, in part, because "the purpose of permanent total disability is to compensate for loss of wage-earning capacity. . . . " *Guy*, 58 So. 3d at 1225-26 (¶11). Alternatively, "the focus is on the functional loss of the use of the body part 'without regard to loss of wage earning capacity.'" *Id*. (quoting *Walker Mfg. Co. v. Cantrell*, 577 So. 2d 1243, 1247-48 (Miss. 1991)).

¶25. For scheduled-member compensation, which is at issue in this case, the "functional loss of the use of the body part" refers to both the "medical" disability and "industrial" disability. In *McGowan v. Orleans Furniture Inc.*, 586 So. 2d 163 (Miss. 1991), the Supreme Court explained that "[g]enerally, 'medical' disability is the equivalent of functional disability and relates to *actual physical impairment*." *Id*. at 166 (emphasis added) (quoting *Robinson v. Packard Elec. Div. Gen. Motors Corp.*, 523 So. 2d 329, 331 (Miss. 1988)); *see Howard Indus. Inc. v. Robbins*, 176 So. 3d 113, 117 (¶19) (Miss. Ct. App. 2015). Whereas, "'industrial' disability is the functional or medical disability *as it affects the claimant's ability to perform the duties of employment*." *Id*. (emphasis added) (quoting *Robinson*, 523 So. 2d at 331). This means that "functional loss" and "industrial loss" are not synonymous. *Foamex Prods. Inc. v. Simons*, 822 So. 2d 1050, 1054 (¶14) (Miss. Ct. App. 2002); *Prairie*

11

*Farms Dairy v. Graham*, 270 So. 3d 37, 42 (¶13) (Miss. Ct. App. 2018).

¶26.    A full explanation of how claims are processed in workers' compensation cases under this framework was given in *Ard v. Marshall Durbin Co.*, 818 So. 2d 1240, 1245 (¶¶24-25) (Miss. Ct. App. 2002):

> At the outset of any proceeding to determine the proper level of compensation for an injury to a scheduled member, there are two basic avenues of approach. The claimant may assert a claim that, by virtue of the residual effects of her injury, she is incapable of obtaining any form of gainful employment and that, as a result, she is entitled to 450 weeks of compensation under Section 71-3-17(a) of the Mississippi Code. Miss. Code Ann. § 71-3-17(a) (Rev. 2000); *Smith v. Jackson Constr. Co.*, 607 So. 2d 1119, 1128 (Miss. 1992). If the claimant does not claim total industrial disability, a scheduled member injury entitles her to appropriate compensation based on the degree of permanent partial disability suffered to the member. Miss. Code Ann. § 71-3-17(c) (Rev. 2000).

¶27.    The agency may "look to the entire factual context to determine whether *total* occupational loss has occurred." *Meridian Prof'l Baseball Club v. Jensen*, 828 So. 2d 740, 750 (¶27) (Miss. 2002).  Although the Commission does not consider the loss of wage earning capacity when the claimant seeks permanent *partial* disability, the claimant may still assert "that for purposes of wage earning capacity, he is *totally* occupationally disabled." *Foamex*, 822 So. 2d at 1053-54 (¶13) (emphasis added) (citing *Alumax Extrusions*, 737 So. 2d at (¶15); *Jackson Const. Co.*, 607 So. 2d at 1125-28; *see generally McManus v. So. United Ice Co.*, 243 Miss. 576, 138 So. 2d 899, 901-02 (1962); *Modern Laundry v. Williams*, 224 Miss. 174, 179-80, 70 So. 2d 832 (1955).  "If a claimant can establish that due to the partial loss of use of a scheduled member, he is unable to perform the substantial acts of his usual employment, the claimant is entitled to the same compensation as for total loss of use of his

member." *Foamex*, 822 So. 2d at 1054 (¶13) (citing *Richey v. City of Tupelo*, 361 So. 2d 995, 998 (Miss. 1978)). "There is a [rebuttable] presumption of 100% industrial loss when the worker proves he can no longer perform the substantial acts of his usual employment." *Bridgeman v. SBC Internet Servs.*, 270 So. 3d 112, 114-15 (¶6) (Miss. Ct. App. 2018) (quoting *Guy*, 58 So. 3d at 1227 (¶16)). "An employer can rebut the presumption of total industrial loss by proving that the claimant has the 'ability to earn the same wages' that he was earning at the time of his injury." *Id.* at 115 (¶8). If the agency determines that the claimant did not suffer total occupational/industrial disability, then the question becomes whether the industrial disability is greater than or less than the medical disability. *Id.* At this point, the "wage earning capacity test" is not to be applied. *Foamex*, 822 So. 2d at 1054 (¶15). But rather a determination is made of functional loss of use presented by medical evidence and the impact that the loss of function has on the worker's ability to perform the normal and customary duties associated with the claimant's usual employment. *Cook v. President Casino*, 740 So. 2d 963, 969 (¶27) (Miss. Ct. App. 1999); *Jackson Constr.*, 607 So. 2d at 1128.

## II.     Present Case

¶28.    This is a scheduled-member case concerning Moore's partial loss of use of her arm after she fell on her elbow at work. Here, the AJ awarded Moore partial industrial disability at a rate of 25%. MTD Products argues that the AJ's finding was not supported by substantial evidence because Moore's physician concluded that Moore suffered a 14% medical disability of her arm. MTD Products claims that the AJ erred by not finding that

13

Moore's industrial disability was equivalent to her medical disability of 14%. We disagree and find that the AJ and Commission's award of 25% partial disability was supported by the evidence.

¶29. In *Meridian* our Supreme Court stated:

> That is, it will sometimes be the case that evidence of a greater occupational disability than would be indicated by the medical evidence alone will justify a higher disability rating, in which case relief is awarded that goes beyond the arbitrary provisions of the schedule.
>
> A worker suffering a scheduled member injury is thus entitled to the higher of the two types of losses, functional or occupational, in the event of a variance in the two. If, for example, [the claimant] had suffered an arm injury which translated to a 25% occupational loss and claimed no more than that, but was also a 40% functional loss, he would be entitled to benefits based on the 40% functional loss. *Cantrell*, 577 So.2d at 1247-48.

*Meridian*, 828 So. 2d at 745-46 (¶¶13-14).

¶30. We reiterated as much in *Levi Strauss & Co. v. Studaway*, 930 So. 2d 481, 486 (¶17) (Miss. Ct. App. 2006), where the employer made the same argument as MTD Products argues today. Similar to this case, the claimant in *Levi* suffered a scheduled-member injury to their arm and their medical disability rating was less than their industrial disability rating. Though the claimant suffered a 17% medical impairment, the Commission found that the claimant suffered an occupational loss of 50%. *Id*. at (¶17).

¶31. Also similar to the case at bar, in *Levi* the employer argued that because it had successfully rebutted the presumption of total occupation loss, the claimant was not entitled to benefits for occupational loss of a scheduled member that was greater than the medical impairment rating. *Id*. at (¶18). We disagreed, explaining that "this [was] not a correct

statement of the law established in *Meridian*" because "as *Meridian* ma[de] clear, rebutting the presumption of total occupational loss does not necessarily preclude an award of benefits for occupational loss in excess of functional loss." *Levi*, 930 So. 2d at 487 (¶19). Neither does the fact that the claimant later earned a higher wage. *Robbins*, 176 So. 3d at 117 (¶21).

¶32. Likewise, in *Robbins* we affirmed the Commission's decision to award the claimant a 90% occupational disability when his medical impairment rating was 45%. *Id*. at 117-18 (¶¶17, 22). We based our decision on the fact that the Commission considered all the evidence and that its decision was supported by the fact that the claimant was "advanced in age, had limited education [(the claimant left high school to join the Navy)], continued to have pain in his left arm, and was restricted to no heavy lifting." *Id*. at (¶¶13, 22).

¶33. After a review of the record, we once again find that there was substantial credible evidence presented to support the enhanced occupational disability rating. Moore was fifty-five years old at the time of her injury. Although she initially studied nursing, she received an associate's degree in general studies. Thereafter, she has worked in the labor industry. Similar to the facts of *Robbins*, Moore has complained of pain in her left arm. The pain that Moore experienced was corroborated by Dr. Pillow's medical reports. Dr. Pillow's medical reports support that Moore had pain and stiffness in her left upper arm. In addition, Moore's testimony and the medical documentation indicated that Moore's injury had an impact on her ability to perform the job and her ability to train for additional jobs.

¶34. Moore's testimony further indicated that she has had to make modifications to her job duties and has been reassigned to different tasks due to her impairment. Moore specifically

15

testified to no longer being trained to work in the baffling area or on the baffling machine because she could not pull the parts out with both hands. Another machine required her to put springs in the doors with both hands. Because she struggles to use her left arm, she said that she uses a screwdriver instead. In addition, Moore testified to having a hard time pushing boxes, lifting the tops of the boxes, putting the rods in the machine, and pulling the rods out of the machine, because these tasks required two hands.

¶35. Given that all these facts were properly considered by the AJ, we conclude that the Commission's and the AJ's decisions were not arbitrary and capricious in finding that Moore suffered a 25% occupational impairment. We affirm the Commission's decision.

¶36. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**